

**FILED**

Feb 01 2019, 8:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
WIENEKE LAW OFFICE, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary
Termination of the Parent-Child
Relationship of D.H., K.H., and
E.H. (Minor Children)

and

L.H. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

February 1, 2019

Court of Appeals Case No.
18A-JT-1861

Appeal from the Adams Circuit
Court

The Honorable Chad E. Kukelhan,
Judge

Trial Court Cause Nos.
01C01-1801-JT-6
01C01-1801-JT-7
01C01-1801-JT-8

**Bailey, Judge.**

# Case Summary

[1] L.H. ("Mother") appeals[1] the trial court's order involuntarily terminating her parental rights to D.H., born October 16, 2006, K.H., born August 24, 2010, and E.H., born May 22, 2014 (collectively, "Children"). The only issue Mother raises on appeal is whether the mishandling of her case by the Indiana Department of Child Services ("DCS") denied her due process.

[2] We reverse and remand with instructions.

# Facts and Procedural History[2]

[3] Mother and Father (collectively, "Parents") had a fourteen-year-long relationship during which Father repeatedly physically abused Mother, often in the presence of their three children. During the relationship, Mother left Father several times, obtained protective orders against Father, and divorced and remarried Father.

[4] In 2012, DCS filed a Child in Need of Services ("CHINS") case because Father was manufacturing methamphetamine in the home, and Mother had tested positive for marijuana and amphetamine. Father was convicted of, and

---

[1] Father voluntarily relinquished his parental rights to Children and does not join in this appeal.

[2] We note that Mother failed to provide a sufficient "Statement of Case" as required under Indiana Appellate Rule 46(A)(5). That rule requires, among other things, a brief statement of the course of the relevant proceedings with citations to the record in accordance with Appellate Rule 22(C). Mother's "Statement of the Case" is one brief sentence with no record citations. Appellant's Br. at 6.

incarcerated for, manufacturing methamphetamine. Mother successfully reunited with D.H. and K.H.[3] and the CHINS case was closed. However, when Father was released from prison in August of 2013, he moved back in with Mother, and the domestic violence continued—often in Children's presence.

[5] In June of 2016, police called DCS to Parents' home due to concerns about the condition of the house. Parents agreed to submit to drug screens and they each tested positive for illegal substances. DCS removed Children from the home and filed a CHINS action. Parents subsequently admitted Children were CHINS, and, in a dispositional decree dated August 2, 2016, the court ordered that they engage in services, including visiting Children, maintaining safe housing, ceasing drug and alcohol use and domestic violence, and engaging in home-based case management, substance abuse assessments and treatment, random drug screens, and counseling through the Center for Non-Violence. Ex. at 83-87.

[6] DCS Family Case Manager ("FCM") Laurie Hoffacker ("FCM Hoffacker") was the FCM from June until the beginning of August of 2016. From approximately August 2016 through June 2017, FCM Mark Buchanan ("FCM Buchanan") was assigned to the CHINS case.[4] *Id*. at 106-07. In September of

---

[3] E.H. was not yet born.

[4] FCM Buchanan did not testify at the termination of parental rights hearing.

2016, after Father again physically abused Mother, DCS referred Mother for individual counseling with Megan Ayers ["Ayers"], a therapist at Lifeline. Ayres began supervising visits with Children in September 2016 and began individual therapy, including addressing domestic violence, with Mother in December 2016. At some point between October 2016 and January 2017, Mother and Father ceased living together.[5]

[7] In a court order on the October 11, 2016, periodic case review, the court noted that DCS recommended that Parents have "therapeutic supervised visitation due to allegations of domestic violence," and "continue to pursue individual therapy, marriage counseling[,] and substance abuse services." Ex. at 32. In a court order on the January 11, 2017, periodic case review, the court found that Mother had obtained employment and was participating in addictions services, homebased casework, and "finding better housing," but noted that Mother had "failed 4 of 11 [drug] screens from October 31, 2016 through December 27, 2016." *Id*. at 29. The court also found that DCS had recommended that Father complete "batterers' intervention." *Id*.

[8] In January 2017, Father entered Shepard's House, a residential drug treatment facility. In a court order on the April 12, 2017, periodic case review, the court found that both Parents were complying with the case plans but had not yet

---

[5] Mother testified that the parties ceased living together in approximately October 2016. Tr. at 15-16. The order on the January 11, 2017, periodic case review found that the parties were living separately at that time. Ex. at 29.

"enhanced [their] ability to fulfill [their] parental obligations." *Id*. at 39. However, the court found that Mother was "cooperating with DCS[,]…ha[d] acquired full-time employment and maintained housing that can accommodate her and her child(ren)[, and] … ha[d] participated in addictions services and home based casework." *Id*. DCS recommended that Father participate in additional services, including "batterer's intervention," and that Mother "continue in individual therapy and marriage counseling after completing substance abuse services and follow all recommendations." *Id*.

[9]     In a June 22, 2017, "Order on Permanency Plan and Order Approving Trial Home Visit to Begin on July 10, 2017 with Father,"[6] the trial court found that Mother had "participated in addiction services and home based casework[, and] … acquired full-time employment and maintained housing that can accommodate her and her children." *Id*. at 35. The court also found that Father had obtained employment and housing and had completed the addiction program at Shepard's House, but—on advice of counsel—had refused to engage in the DCS-recommended "Batterer's Intervention Program" on the grounds that it "may incriminate him." *Id*. The trial court ordered a permanency plan of reunification and ordered an unsupervised trial home visit with Children at

---

[6] DCS's progress report and recommendations regarding permanency (Ex. at 6, CCS) were not filed as part of the record on appeal; therefore, it is unclear whether it was DCS's or Father's request for a trial home visit that was "approved" by the court. However, we note that the CCS does not indicate that Father filed a request for a trial home visit.

Father's home and ordered that "[v]isitation with the children and their mother is to be worked out between the parties." *Id*. at 37.

[10] From approximately July 2017 through September 2017, FCM David Meyers ("FCM Meyers") was the FCM assigned to the CHINS case.[7] Tr. at 106-07. In approximately August of 2017, during Mother's visitation with Children during the time of the unsupervised trial home visit at Father's house, Father again physically abused Mother in Children's presence.

[11] On approximately September 26, 2017, K.H. informed Mother that Father had sexually abused K.H. "a couple of days before."[8] *Id*. at 20. On September 27, DCS interviewed K.H. regarding sexual abuse allegations, but K.H. did not disclose any such allegations. In the order on the September 29 periodic case review, the trial court found that Father's trial home visit with Children "failed due to allegations of sexual abuse." Ex. at 42. The court found that Mother was "complying with the child[ren]'s case plan[s]" but Father was not. *Id*. The court further found that Mother was cooperating with DCS, participating in "home based casework" and addiction services, "passed all of her drug screens," and assisted in correcting safety hazards in her home. *Id*. The trial court noted that Mother was participating in supervised visitation with Children but Father had had no visitation with Children since the trial home visit ended.

---

[7] FCM Meyers did not testify at the termination of parental rights hearing.

[8] DCS Exhibit 11 indicates that DCS interviewed K.H. about sexual abuse on September 27, 2017. Ex. at 45. Mother testified that K.H. told her about the sexual abuse "the night before it was reported." Tr. at 20.

The trial court found that "[a]dditional services are not recommended for the child[ren] or the child[ren]'s parents at this time," but ordered that previously ordered services pursuant to the dispositional decree remained in effect. *Id*. at 42, 43.

[12] In October of 2017, FCM Naika Esperance ("FCM Esperance") was assigned to the CHINS case.[9] At the end of October, FCM Shonna Leas ("FCM Leas") was assigned to the CHINS case. The only prior family case manager with whom FCM Leas "brief[ly]" spoke about the case was FCM Esperance. Tr. at 107. FCM Leas reviewed "most" of the CHINS file upon taking over responsibility for the case. *Id*. FCM Leas was unaware of what services Mother had completed and what services Mother was still required to complete. *Id*. at 107-110.

[13] In November of 2017, DCS again interviewed K.H. regarding the allegations of sexual abuse. At that time, K.H. stated that Father had sexually abused her. DCS referred K.H. to Lifeline for trauma-focused therapy.

[14] In December of 2017, Mother allowed Father to stay in Mother's house for four days because Father had lost his housing. Father again physically abused Mother, causing her to be hospitalized. Father was arrested, charged with aggravated battery, and incarcerated on December 16.[10] Ex. at 54. An order

---

[9] FCM Esperance did not testify at the termination hearing.

[10] We take judicial notice of the fact that Father was convicted of aggravated battery, as a Level 3 felony, and sentenced to nine years in prison and that his projected release date is December 12, 2024.

was issued prohibiting Father from contacting Mother.[11]  Soon thereafter, Mother reported the domestic violence incident to FCM Leas and gave FCM Leas "some background on her past abuse history with [Father]."  Tr. at 109.  FCM Leas and Mother also discussed K.H.'s allegations that Father sexually abused K.H., and Mother stated to FCM Leas that she "can't believe that it happened."  *Id.*

[15]  On January 16, 2018, DCS filed its petition for involuntary termination of the parent-children relationships.  The reasons DCS sought termination of Parents' rights were: (1) Mother did not believe Father had sexually abused K.H.; (2) there had been continued domestic violence throughout the course of Parents' relationship; (3) Father was unavailable due to incarceration; and (4) substance abuse issues still existed with both parents.  Ex. at 58.  At the March 15, 2018 permanency hearing, Father was still incarcerated for aggravated battery against Mother, and he was also under investigation on allegations of sexually abusing K.H.  Mother was not present at the hearing—although her counsel was present—because she thought the hearing was on a different date.  FCM Leas testified[12] that "the issues that were present at the time of removal in 2016 are still present today and have not been remedied."  *Id.* at 59.  The Guardian ad

---

https://www.in.gov/apps/indcorrection/ofs/ofs?offnum=238733&search2.x=32&search2.y=18 (last visited January 10, 2019).  Ind. Evidence Rule 201(a), (c).

[11]  It is not clear from the record who requested the no-contact order.

[12]  The transcript of the March 15, 2018, hearing is not contained in the record.

Litem ("GAL") concurred with DCS that the permanency plan should be termination of parental rights.

[16] In a permanency order dated April 9, 2018, the trial court found, based on the testimony of one of K.H.'s therapists, that "it would be a setback in [K.H.'s] therapy if [she] were to see either parent." *Id.* at 57. The court found that K.H. associates both Parents with trauma relating to domestic violence, and "she would regress in therapy if there were any type of contact." *Id.* The court found that FCM Leas "has also discussed the current case with [Mother]. [Mother] does not believe [the] sexual abuse allegations that [K.H.] has made against her father." *Id.* at 58. The court found that there is "an allegation that [K.H.] told [Mother] about the sexual abuse before this and [Mother] did nothing about it." *Id.* at 59. The court ordered no visitation for either Parent and approved a permanency plan of termination of parental rights and adoption.

[17] At the May 19, 2018, hearing on the termination petition, the trial court noted that Father had voluntarily relinquished his parental rights to Children in an earlier proceeding. Tr. at 4. Mother testified that she had housing that could accommodate Children. Regarding K.H.'s allegations of sexual abuse, Mother testified that she "never would have thought [Father] would have ever done anything like that[,]" but "after reading [K.H.'s] reports, I don't have any doubt." *Id.* at 21.

[18]     Regarding Mother's cooperation and compliance with the case plan, Ayres testified that Mother began participating in individual therapy with her in December of 2016, to address domestic violence. Mother did well and progressed in therapy until she began missing appointments in March or April of 2017, after Father left Shepard's House. *Id*. at 53-54, 59. At that time, Ayres discontinued Mother's therapy due to the missed appointments. *Id*. at 55. Ayres testified that Mother needed to engage in a trauma narrative, but they did not have time to do so before services were cancelled. *Id*. at 53, 56. Ayres did not consider Mother to have successfully completed therapy, although she testified that, when Father was released from Shepard House, "there were no other services to provide [Mother] besides what were in place to help her break away from [Father]." *Id*. at 56, 68.

[19]     FCM Leas testified that Mother had five different FCMs during the pendency of the CHINS and termination proceedings. When she took over the case at the beginning of November of 2017, FCM Leas reviewed "most" of the case file. *Id* at 107. FCM Lease did not speak to any other FCM about the case other than a brief conversation with FCM Esperance, who had only been assigned to the case for the previous month. *Id*. FCM Leas believed Mother had services in place at the time she took over the case, but she was not sure. FCM Leas was "not sure" whether Mother participated in programming at the Center for Nonviolence. *Id*. at 108. FCM Leas asked someone in her office to follow up with Park Center regarding Mother's drug abuse treatment, but she "never heard anything back from Park Center." *Id*. FCM Leas thought Mother was

getting drug screens through Park Center, but she did not remember whether she had seen the results of those drug screens. *Id*. The last two times FCM Leas spoke with Mother she asked Mother to come in for drug screening, and, each time, Mother did so, and her drug screens were negative. *Id*. at 115. FCM Leas did not ask Mother to do any other drug screens and did not recall the date Mother had last failed a drug screen.[13] *Id*. at 115, 118.

[20] Although Mother asked FCM Leas in December of 2017 "what she needed to do to get the kids, to get supervised or at least supervised visitation,"[14] FCM Leas did not refer Mother to any services, nor did she encourage Mother to seek any services. *Id*. at 109, 117. Mother and FCM Leas "talked about getting together with the [Guardian ad Litem] and all the attorneys to try and figure out what needed to be done[, b]ut that meeting didn't ever happen … due to people's schedules and stuff." *Id*. at 109-110. A meeting that was scheduled for April 2018 did not happen because Mother reported that she was unable to get there due to car trouble. *Id*. at 123. That meeting was not rescheduled. *Id*.

[21] Mother and FCM Leas spoke several more times and each time Mother sought information about what she needed to do to get supervised visitation and/or reunification with Children. Mother stated that she had already completed the

---

[13] The most recent evidence in the record of Mother's drug screens—aside from Mother's and FCM Leas's testimony—is DCS's Exhibit 48 which shows that Mother had a positive drug screen in February of 2017. Ex. at 180.

[14] Neither the trial court termination order nor the parties indicate when Mother's supervised visitation with Children was discontinued prior to December 2017, nor are we able to locate that information in the record.

services to which she had been referred, and FCM Leas instructed Mother to bring her documentation that services had been completed so that they "could figure out some other services that would be beneficial for her." *Id*. at 110. In March or the beginning of April 2018, FCM Leas and Mother "were trying to set up a date … for [Mother] to come in" to "figure out what services" Mother needed, "[be]cause [FMC Leas] was [not] going to make [Mother] do the exact same services if she'd had [sic] already completed them." *Id*. at 110, 120. FCM Leas testified that Mother "said that she would do services and [FCM Leas] told her we just needed to figure out what would work." *Id*. at 123. FCM Leas had never been to Mother's house.

[22] FCM Leas testified that, in March 2018, Mother informed her that Father was incarcerated, Mother was going to divorce Father, and Father was "out of the picture." *Id*. at 111. However, FCM Leas testified that Mother's relationship with Children would "probably pose a threat because of the pattern of domestic violence" and because she "would just be fearful that, you know, that [Mother] would find other men who would be as violent as well." *Id*. at 116. FCM was not aware of Mother ever being abused by anyone other than Father. *Id*. at 119. FCM Leas did not believe that the termination of Father's parental rights or his incarceration would stop future domestic violence because she "just [had] a feeling" that Mother would reunite with Father whenever he was released from incarceration. *Id*. at 116. She testified DCS makes the decision to move for termination of parental rights when the child is out of the home "fifteen out of twenty-two months" and "based on whether or not they have been compliant

with services." *Id.* at 119. FCM Leas testified that the decision to move for termination in Mother's case "was basically based on the fact [of] the continuing domestic violence and … the sexual abuse." *Id.*

[23] In mid-June 2018, Father was charged with three counts of Level 1 felony child molesting and one count of Level 4 felony child molesting related to the allegations of sexual abuse of K.H., and Father was incarcerated pending jury trial, which is scheduled for April 9, 2019. Case No. 02D05-1806-F1-8.[15]

[24] In an order dated June 26, 2018, the trial court concluded that there was a reasonable probability that the Mother-Children relationship posed a threat to Children's well-being and that termination of that relationship was in Children's best interest. Appealed Order at 4-5. It therefore granted the termination petition. Mother now appeals.

# Discussion and Decision

[25] Mother maintains that the trial court's order terminating her parental rights violated her due process rights.[16] The State contends, as a threshold issue, that Mother has waived her due process argument by failing to raise it in the trial court. Generally, a party waives on appeal an issue that was not raised before

---

[15] We take judicial notice of this case, which we accessed through Odyssey, our electronic case management system. Evid. R. 201.

[16] Mother does not state whether her due process claim is pursuant to the federal or state constitutions—or both. Regardless, the due process analysis under each constitution is the same. *E.g.*, *Cooper v. State*, 760 N.E.2d 660, 666 (Ind. Ct. App. 2001*), trans. denied.*

the trial court. *See, e.g.*, *Plank v. Cmty. Hosp. of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013). However, we have discretion to address such claims, especially when they involve constitutional rights, the violation of which would be fundamental error. *Id.* at 53-54; *see also*, *e.g.*, *S.B. v. Morgan Cty. Dep't of Public Welfare* (*In re L.B.*), 616 N.E.2d 406, 407 (Ind. Ct. App. 1993) (citations omitted) ("The constitutionally protected right of parents to establish a home and raise their children … mandates that the failure of a trial court to require compliance with any condition precedent to the termination of this right constitutes fundamental error which this court must address sua sponte."), *trans. denied*. Here, Mother's substantive due process right to raise her children and her procedural due process right to fair proceedings are at issue; therefore, we exercise our discretion to review Mother's due process claim even though it was not raised below. *Plank*, 981 N.E.2d at 53-54; *see also Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015) (quotation and citation omitted) ("[W]henever possible, we prefer to resolve cases on the merits. …").[17]

[26] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things: (A) that the child has been removed from the parent for at least fifteen of the most recent twenty-two months; (B) that there is a reasonable probability that the conditions resulting in the child's removal will not be remedied or the continuation of the parent-child

---

[17] The State also contends that Mother waived her arguments by failing to cite authority or provide cogent argument, in violation of Indiana Appellate Rule 46. We find Mother's briefs sufficient under that rule.

relationship poses a threat to the child's well-being; and (C) termination is in the best interests of the child. Ind. Code § 31-35-2-4(b)(2).

[27] Although Indiana law requires DCS to file a termination petition when the child has been removed from the parent's home for fifteen of the most recent twenty-two months, DCS is also required to state in the petition whether at least one factor would apply as the basis for filing a motion to dismiss the termination petition. I.C. § 31-35-2-4.5(d); *Phelps v. Sybinsky*, 736 N.E.2d 809, 814 (Ind. Ct. App. 2000), *trans. denied*. Such a statement in the termination petition is required if "any of the following circumstances apply:

> (1) That the current case plan … has documented a compelling reason, based on facts and circumstances stated in the petition or motion, for concluding that filing, or proceeding to a final determination of, a petition to terminate the parent-child relationship is not in the best interests of the child. …
>
> (2) That:
>
>     ***
>
> > (B) the department … has not provided family services to the child, parent, or family of the child in accordance with a currently effective case plan … or a permanency plan or dispositional decree …, for the purpose of permitting and facilitating safe return of the child to the child's home; and
> >
> > (C) the period for completion of the program of family services, as specified in the current case plan, permanency plan, or decree, has not expired.

(3) That:

> \*\*\*

> (B) the department has not provided family services to the child, parent, or family of the child, in accordance with applicable provisions of a currently effective case plan …, or a permanency plan or dispositional decree …; and

> (C) the services that the department has not provided are substantial and material in relation to implementation of a plan to permit safe return of the child to the child's home.

The motion to dismiss shall specify which of the allegations described in subdivisions (1) through (3) apply to the motion. If the court finds that any of the allegations described in subdivisions (1) through (3) are true, as established by a preponderance of the evidence, the court shall dismiss the petition to terminate the parent-child relationship.

I.C. § 31-35-2-4.5(d); *Phelps*, 736 N.E.2d at 814. Furthermore, if any ground for dismissal applies, the "statute requires that the petition to terminate must indicate that a motion to dismiss is forthcoming." *P.E. v. Johnson Cty. Dep't of Child Serv.* (*In re Kay.L.*), 867 N.E.2d 236, 240 n.3 (Ind. Ct. App. 2007) (citing *Phelps*, 736 N.E.2d at 814).

[28] A parent's interest in the upbringing of his or her child is "perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s]." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). And the "involuntary termination of parental rights is an extreme measure that is designed to be used

as a last resort when all other reasonable efforts have failed." *Z.G. v. Marion Cty. Dep't of Child Serv. (In re C.G.)*, 954 N.E.2d 910, 916 (Ind. 2011). Therefore, "the certainty of a trial court's decision to terminate a parent's parental rights to his or her child is paramount." *A.A. v. Ind. Dep't of Child Serv. (In re V.A.)*, 51 N.E.3d 1140, 1144 (Ind. 2016). And we review such a decision under a "heightened standard" requiring clear and convincing evidence that termination is appropriate. *Id.* However, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Office of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.*

[29] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. Usually, when a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).[18] However, in this case, Mother does not challenge either the findings or specific conclusions; rather, she contends that the termination order must be reversed because DCS mishandled her case to such an extent that it denied her due process of law.

---

[18] First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.*

When the State seeks to terminate parental rights, "it must do so it in a manner that meets the requirements of due process." *M.K. v. Marion Cty. Dep't of Child Serv. (In re J.K.)*, 30 N.E.3d 695, 699 (Ind. 2015) (quotations and citations omitted). The nature of the process due in proceedings to terminate parental rights is governed by a balancing of the "three distinct factors" specified in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. *Phelps v. Porter Cty. Off. of Family & Children (In re A.P.)*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied*.

> The private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of his or her child. And the State's interest in protecting the welfare of a child is also substantial. Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions.

*K.M. v. Ind. Dep't of Child Serv. (In re S.L.)*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (citing *In re C.G.*, 954 N.E.2d at 917).

In looking at the risk of error created by DCS's actions, we keep in mind that "due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." *J.A. v. Ind. Dep't of Child Serv. (In re G.P.)*, 4 N.E.3d 1158, 1165 (Ind. 2014) (quotations and citations omitted). "[T]hese two

proceedings—CHINS and TPR—are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter." *Id.* And "[a]ny procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *In re S.L.*, 997 N.E.2d at 1120; *see also A.S. v. Ind. Dep't of Child Serv.* (*Matter of C.M.S.T.*), 111 N.E.3d 207, 213 (Ind. Ct. App. 2018) (holding that "the chaotic and unprofessional handling" of a CHINS case violated the parents' due process rights, requiring reversal of the termination order).

[32] For example, in *Matter of C.M.S.T.*, we held that procedural irregularities in the CHINS case—such as multiple FCMs, inappropriate behavior by FCMs, and apparent bias of FCMs—contributed to the parents' non-compliance such that termination of their parental rights amounted to a denial of their due process rights. 111 N.E.3d at 213, 14. *See also, In re A.P.*, at 1117 (finding parents' due process rights were violated in a termination action where DCS made multiple procedural errors, such as failing to provide parents with copies of case plans and filing CHINS and termination petitions that did not meet statutory requirements); *cf. N.P. v. Ind. Dep't of Child Serv.* (*In re R.P.*), 949 N.E.2d 395, 403 (Ind. Ct. App. 2011) (citing *J.I. v. Vanderburgh Cty. Off. of Family & Children* (*In re A.I.)*, 825 N.E.2d 798, 816 (Ind. Ct. App. 2005) (noting that one procedural deficiency alone may not result in a due process violation), *trans. denied*).

[33] We must also consider the general proposition that, "if the State imparts a due process right, then it must give that right." *In re C.G.*, 954 N.E.2d at 918 (citing

*In re A.P.*, 734 N.E.2d at 1112).  Indiana Code Sections 31-35-2-4.5(d)(2) and
(3) require that DCS file a motion to dismiss an otherwise-required termination
petition when DCS has failed to provide family services and either the period
for completion of the services has not expired or the services are substantial and
material in facilitating return of the child to the home.  *Phelps*, 736 N.E.2d at
814.  And DCS's own policy manual, of which we take judicial notice, *see* Evid.
R. 201(a), provides unequivocal directions to DCS regarding the provision of
services.  First, it states that DCS "will provide family services to all children
and families with an open case."  Indiana Dep't of Child Serv. Child Welfare
Policy Manual ("the Manual"), Ch. 5, Sec. 10,
www.in.gov/dcs/files/5.10%20Family%20Services.pdf (last visited January 10,
2019).  Next, Chapter 5, Section 10 of the Manual states:

> DCS will … develop a Family Service Plan … [and] *will make
> appropriate service referrals* on behalf of the … family …  DCS *will
> regularly communicate with all service providers throughout the life of the
> case* to discuss the family's progress and any concerns.

> DCS *will reassess* the strengths and *needs of the child and family
> throughout the life of the case and will adjust services*, if necessary, to
> meet identified needs.  DCS will continue to offer services to the
> … family *regardless of participation*.

> ***

> The FCM will: … (3) Collaborate with the family and the CFT
> [Child and Family Team] to *identify needed services* … (5) Monitor
> the family's progress by: (a) *maintaining contact with services
> providers to assess the family's level of participation* in services. …(8)

> Discuss the family's participation and progress regarding case goals and results of any new assessments … and *adjust services and/or service levels as necessary* … (9) *Document* in Management Gateway for Indiana Kids (MaGIK) the family's progress, reasons for service type or intensity changes, and if applicable, reasons why services were not offered or were stopped. …
>
> The FCM will: … (3) *Follow up with service providers* to evaluate the family's response to the change and/or removal of services. …

*Id*. (emphasis added).

[34]     FCM Leas's own testimony shows that she did none of the above when she took over the CHINS case at the beginning of November of 2017 (i.e., before the termination petition was filed in mid-January 2018), despite Mother's request for, and willingness to participate in, any necessary services. FCM Leas admitted that, before DCS filed for termination in this case, she: did not reassess Mother's needs and adjust and refer services for Mother, regardless of Mother's participation; did not know what services Mother had already completed or what services she still needed;[19] and did not maintain contact with Mother's service providers to assess Mother's level of participation in services and/or evaluate Mother's response to the change and/or removal of services. Essentially, FCM Leas knew little-to-nothing about Mother's service needs and

---

[19] Assuming FCM Leas's predecessor FCMs followed DCS policy, Mother's past participation in services would have been documented in DCS's "MaGIK" system and, therefore, would have been accessible to FCM Leas. *Id*.

compliance or non-compliance with services; yet DCS moved for termination of Mother's rights anyway. And it did so without noting, as required by law, that there were grounds to move to dismiss[20] the termination petition because of DCS's failure to identify and/or provide necessary family services while the CHINS case was open.[21] I.C. § 31-35-2-4.5(d)(2) and (3). That failure created the risk of a premature, erroneous termination of Mother's rights on the grounds that she was not complying with services.

[35] DCS also failed to note in its termination petition that it had failed to provide a visitation plan in compliance with its own policy regarding the provision of a visitation plan for families in which domestic violence has been identified. Chapter 8, Section 12 of the Manual provides that DCS "will develop a Visitation Plan." www.in.gov/dcs/files/8.12%20Developing%20the%20Visitation%20Plan.pdf (last visited January 11, 2019). And, "where domestic violence has been identified," the "FCM will: … (2) Offer separate visitation time for the non-offending parent and the alleged domestic violence offender; … and (5) Ensure

---

[20] Rather, the termination petitions stated that "Subsection 4.5 Dismissal Factors Do Not Apply." Appendix at 13.

[21] It is true, as the State points out, that DCS's failure to provide services, cannot "serve as a basis on which to directly attack a termination order as contrary to law." *A.Z. v. Ind. Dep't of Child Serv.* (*In re H.L.*), 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009); *see also B.M. v. Marion Cty. Off. of Family & Children* (*In re E.E.*), 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) (citation omitted) (noting, in termination proceedings, DCS is not required to plead and prove it offered services). However, DCS's failure to comply with state law requiring that it move to dismiss a termination petition when it failed to provide necessary services may form the basis for a procedural due process claim. *In re C.G.*, 954 N.E.2d at 918; *Phelps*, 736 N.E.2d at 814. Furthermore, we note that a parent's rights cannot be terminated for her failure to engage in services that she "was never asked to do." *In re V.A.*, 51 N.E.3d at 1151 (quoting *Bester*, 839 N.E.2d at 149).

there is no overlap of parental visitation time" between the non-offender and the alleged offender. *Id*. The Manual further notes that "[a]mple time should be included for the non-offending parent to pick up or drop off the child or to arrive and leave the premises without being forced to interact with the alleged domestic violence offender." *Id*.

[36] Yet, here, although Mother was not living with Father at the time of the June 22, 2017, order on the permanency plan, *see* Ex. at 35, and DCS had already identified domestic violence in the family, the trial court ordered—and DCS did not object—that Father would have an unsupervised trial home visit with Children, and Mother would "work[ ] out" visitation with Father, *id*. As a result, contrary to DCS's written visitation procedures, Mother did not have a visitation plan that would allow her to visit with Children "without being forced to interact with" Father.

www.in.gov/dcs/files/8.12%20Developing%20the%20Visitation%20Plan.pdf (last visited January 11, 2019). Therefore, Mother visited Children at Father's home without third party supervision and, predictably, during one such visitation Father physically abused Mother in Children's presence. Thus, the procedural failure on the part of DCS to provide a visitation plan pursuant to its own written visitation procedures contributed to the Children witnessing Father commit domestic violence against Mother. This procedural error was then compounded by DCS's subsequent petition to terminate Mother's parental rights on the grounds that she had not protected Children from witnessing domestic violence, without also noting that DCS had failed to provide services

that were "substantial and material" in relation to the reunification goal of protecting Children from witnessing domestic violence. I.C. § 31-35-2-4.5(d)(3).

[37] The significant procedural irregularities in the CHINS case created a risk of the erroneous filing of a petition to terminate Mother's parental rights to Children, in violation of Mother's due process rights. Thus, under the *Mathews* analysis, the termination of Mother's parental rights violated the requirements of due process. *See In re G.P.*, 4 N.E.3d at 1166. Moreover, the termination order must be reversed due to the State's failure to give Mother the due process imparted to her by Indiana Code Section 31-35-2-4.5(d)—i.e., the right to have DCS move to dismiss a termination petition when it has not provided her with services that were substantial and material in relation to the reunification plan. *See In re G.P.,* 4 N.E.3d at 1166; *Phelps*, 736 N.E.2d at 814.

# Conclusion

[38] In light of DCS's significant and admitted procedural failings in this case, we reverse the termination of Mother's parental rights to Children. We remand to the trial court for reinstatement of the CHINS cases, a re-examination of the requirements for Mother's reunification with Children, and a revised dispositional order outlining the services Mother must complete in order to reunify with Children.

Reversed and remanded.

Bradford, J., and Brown, J., concur.