## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 09 2020, 8:30 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Brad J. Weber
Decatur, Indiana

Cara S. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Termination of the Parent-Child Relationship of:

L.P., S.P., S.W., and S.W.

K.P. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

September 9, 2020

Court of Appeals Case No.
20A-JT-652

Appeal from the Adams Circuit Court

The Honorable Chad E. Kukelhan, Judge

Trial Court Cause No.
01C01-1909-JT-24, 01C01-1909-JT-25, 01C01-1909-JT-26, & 01C01-1909-JT-27

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, K.P. (Mother), appeals the trial court's Order terminating her parental rights to her minor children, Sh.W., Sa.W., S.P. and L.P. (collectively, Children).

We affirm.

# ISSUE

Mother presents the court with one issue, which we restate as: Whether the Department of Child Services (DCS) violated her due process rights by failing to make adequate efforts to reunify her with Children before seeking termination of her parental rights.

# FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of twin girls Sh.W. and Sa.W, born April 27, 2011, S.P., born July 23, 2015, and L.P., born September 7, 2016.[1] S.P. and L.P. resided with Mother in Decatur, Indiana, while the twins lived with their father until he died in a car crash in February 2018. Thereafter, Mother had physical custody of all four Children.

Mother has an extended history of drug abuse which began when she was introduced to drugs at the age of six by a relative who was sexually molesting

---

[1] The twins' father is deceased. The fathers of S.P. and L.P. do not participate in this appeal.

her.[2]  Mother accumulated seven convictions for drug possession and two convictions for syringe possession before entering the Adams Superior Court Drug Court on December 21, 2017.  On January 11, 2018, the State filed its first notice that Mother had violated the terms of her Drug Court placement.  Between January 11, 2018, and April 2018, the State filed at least five additional notices of Drug Court violation against Mother.

[6]  On April 3, 2018, DCS removed Children from Mother's care when she was incarcerated due to violating the terms of her Drug Court placement by testing positive for fentanyl and other opiates.  As a sanction, the Drug Court provided Mother with a choice between serving time in jail or attending in-patient substance abuse treatment.  Mother chose substance abuse treatment, which was paid for by DCS, and entered treatment at a facility in Indianapolis in May 2018.  The twins were placed in a home together with their step-mother, where they have resided ever since.  By July 2018, S.P. and L.P. were placed together in a foster home, where they have resided ever since.

[7]  On April 4, 2018, DCS filed a petition alleging that Children were children in need of services (CHINS).  On April 20, 2018, Mother admitted that Children were CHINS due to her inability to provide and care for them due to her incarceration.  Following these admissions, the trial court ordered Mother to participate in any assessments and programs recommended by the family case

---

[2]  In contravention of the appellate rules, Mother has included details of her involuntary introduction to drugs that do not appear in the record.  *See* Ind. Appellate Rules 46(A)(6)(a) and 22(C).

manager (FCM) or other service providers, maintain safe and stable housing, maintain a legal and stable source of income, refrain from the use of illegal controlled substances, and to refrain from using prescription medication except when and how validly prescribed. The permanency plan for Children was reunification with Mother.

[8] Mother had weekly supervised parenting time with Children as she worked through the later phases of her in-patient substance abuse treatment. Mother completed treatment in October 2018, and she moved back to Decatur as required to complete her Drug Court placement. Mother participated in bi-weekly therapy and case management services through Drug Court. In November 2018, DCS FCM Desirae Miller (FCM Miller) met with Mother's Drug Court case manager Kelly Sickafoose (DCCM Sickafoose) to discuss additional case management services to address Mother's housing issues. DCCM Sickafoose was confident that Mother could address her housing issues through her current Drug Court services, so no DCS-provided services were added. Also in November, DCS began the process of adding supervised parenting time, which involved coordinating two transports for Children, the twins' school schedule, and Mother's work schedule. Mother was frustrated with the amount of parenting time she was able to exercise, but from October 2018 to March 2019, Mother was compliant with her DCS and Drug Court services.

[9] On March 20, 2019, Mother tested positive for fentanyl, which she blamed on accidental exposure. DCS allowed Mother to exercise supervised parenting in

Children's maternal grandparents' home, and, although the frequency of her parenting time was never increased, the length of her parenting time increased to five or six hours at a time. Mother did not exhibit a strong parental bond with Children during her parenting time, often allowing Children to watch television and play with electronic devices. Supervisors observed that Children's grandparents often interacted more with Children than Mother during parenting time. On one occasion, Mother chose to take a nap with S.P. and L.P during a parenting time session, leaving the twins unattended and not exercising her parenting time to the fullest.

[10] On May 14, 2019, Mother and L.P.'s father were found by law enforcement sleeping in a car. Narcotics, cocaine, and a syringe were also found in the car. Mother was arrested and charged with multiple drug and paraphernalia possession offenses. Mother continued to use illegal drugs in jail and was transported to the hospital on May 28, 2019, and treated for a drug overdose. Mother had three positive drug screens while in custody awaiting the disposition of her new charges. Mother eventually pleaded guilty to possession of a narcotic drug and possession of cocaine. Mother was unsuccessfully discharged from Drug Court on June 25, 2019.

[11] On July 15, 2019, after a hearing, Children's permanency plan was changed from reunification to termination of parental rights and adoption. On September 11, 2019, DCS filed its petition seeking the termination of Mother's parental rights. On January 28, 2020, the trial court held a hearing on DCS's petition. Mother had received a sanction from Drug Court and had been

sentenced on her most recent convictions. Her earliest expected release date was April 2022. Mother confirmed in her testimony that she had worked on stabilizing her housing and employment with her Drug Court contacts and that they had helped her to address those issues.

[12] FCM Miller testified that part of DCS's efforts to increase Mother's parenting time was to identify and qualify other people to supervise her time with Children. Mother identified two candidates, who returned their paperwork for background checks shortly before Mother was arrested on May 14, 2019. FCM Miller also testified that DCS has a program to provide financial assistance once a parent has located a home but that it does not have a separate program to assist a parent in locating an appropriate home. FCM Miller related that after DCCM Sickafoose had provided all the assistance on housing she was able to offer through Drug Court's resources, FCM Miller referred Mother to home-based services to address her housing issues, and it was finally arranged that Mother would receive services to address her housing issues through her therapist.

[13] Children were thriving and were well-bonded in their respective pre-adoptive homes. The twins had been treated for anxiety and depression and had experienced substantial improvement when parenting time with Mother ceased in May 2019 after she was incarcerated. FCM Miller and Children's guardian *ad litem* both opined that it was in Children's best interests to have Mother's parental rights terminated and that they be adopted by their current placements.

On February 24, 2020, the trial court entered its detailed Order terminating Mother's parental rights to Children.

[14] Mother now appeals. Additional facts will be provided if necessary.

## DISCUSSION AND DECISION

### I. *Waiver*

[15] Mother argues that her due process rights were violated by the termination of her parental rights to Children. As a threshold issue, we address the State's argument that Mother waived her due process claim by failing to raise it to the trial court. Our supreme court has recognized that failure to raise even a constitutionally-based due process claim at trial may result in waiver of the issue for appeal. *In re N.G.*, 51 N.E.3d 1167, 1173 (Ind. 2016). However, in cases such as the one before us that implicate a parent's substantive and procedural due process rights to raise their children, we have the discretion to review claims that were not raised below. *See Matter of D.H.*, 119 N.E.3d 578, 586 (Ind. Ct. App. 2019) (electing to decide the case on the merits despite Mother's waiver of her due process claims), *trans. denied*. Mother acknowledges that she did not raise this claim before the trial court. "[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied.* Indeed, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Given the importance of the interests at

stake, we elect to address the merits of Mother's claim, despite her waiver. *See D.H.,* 119 N.E.3d at 586.

## II. *Due Process*

[16] The Fourteenth Amendment to the United States Constitution provides that "no person shall be deprived of life, liberty, or property without due process of law." U.S. Const. Amend. XIV. This Fourteenth Amendment right extends to termination proceedings, and, when the State seeks to terminate parental rights, it is required to do so in a manner consistent with a parent's due process rights. *In re G.P.,* 4 N.E.3d 1158, 1165 (Ind. 2014). Due process has never been precisely defined, but the cornerstone of the right is that of fundamental fairness. *In re C.G.,* 954 N.E.2d 910, 917 (Ind. 2011). In determining the nature of the process due in any given procedure, we balance three factors: (1) the private interests affected by the proceeding; (2) the governmental interest in supporting the use of the challenged procedure; and (3) the risk of error created by the State's chosen procedure. *D.H.,* 119 N.E.3d at 588. Because the private and governmental interests in a CHINS or termination case are both substantial, we focus on the risk of error created by the State's and the trial court's actions. *C.G.,* 954 N.E.2d at 917-18.

[17] Mother argues that her "substantive due process right to raise her children and her procedural due process right to fair CHINS and termination proceedings were violated in this case." (Appellant's Br. p. 11). Mother more specifically contends that the State failed to make reasonable efforts to reunify her with Children by failing to assist her with finding suitable housing and failing to

provide her with additional parenting time. As to her contention regarding assistance with housing, Mother asserts that "DCS claimed it had no programming to assist Mother in finding suitable housing." (Appellant's Br. p. 13-14). While it is true that FCM Miller testified at the termination hearing that DCS had no separate program to assist in locating housing, there is ample evidence in the record that DCS had services as part of its home-based counseling that it offered to Mother and that Mother received assistance through Drug Court and through her therapist. Therefore, we conclude that Mother's due process rights were not violated by any failure of DCS to provide her with assistance in locating suitable housing.

[18] Regarding the provision of additional parenting time, Mother argues that, despite remaining sober for "nearly a year" and complying with the requirements of her services, she "was never allowed to progress toward reunification with her children." (Appellant's Br. p. 13). Mother participated in an in-patient substance abuse treatment from May 2018 until mid-October 2018. An order on a periodic case review hearing held October 15, 2018, noted that "Mother is continuing to participate in services but will need to demonstrate the ability to maintain sobriety." (Exh. Vol., p. 29). In November 2018, DCS began the process of adding parenting time sessions but experienced difficulties in scheduling additional sessions in part because of differing schedules for Children's transport providers, school, and Mother's work. Despite Mother testing positive for fentanyl in March 2019, DCS moved Mother's parenting time into her mother's home and eventually increased the

duration of parenting time to five or six hours. In order to address Mother's desire for additional parenting-time sessions, DCS also worked with Mother to identify additional people to supervise her sessions with Children, a process that had only just been completed before Mother was arrested on May 14, 2019, on drug and drug paraphernalia charges.

[19] Therefore, DCS allowed Mother to make progress toward reunification through the moving of her sessions into her mother's home and an increase in duration of parenting-time sessions, and Mother's ability to make further progress was cut short by her own actions leading to her arrest and incarceration. DCS's gradual increase in parenting time had a low "risk of error" and was reasonable, fair, and warranted given that Mother had a long history of serious drug abuse and she had only been out of supervised substance abuse treatment for approximately one month before DCS began addressing her desire for additional parenting time. *C.G.*, 954 N.E.2d at 917-18.

[20] Mother directs our attention to our decision in *In re T.W.*, 135 N.E.3d 607, 615 (Ind. Ct. App. 2019), *trans. denied*, in which we reversed a trial court's termination of parental rights order and held that "for a parent's due process rights to be protected in the context of termination proceedings, DCS must have made reasonable efforts to preserve and/or reunify the family unit in the CHINS case[.]" *T.W.* entailed a FCM failing to make promised referrals for the father, the father being provided misinformation by the prosecutor's office regarding establishing paternity which sidelined his application, the FCM mistakenly sending drug screen information to the father at an outdated

address, and the FCM failing to inform the father that his first supervised parenting time session had been cancelled. *Id*. at 609-11. However, *T.W.* is factually distinguishable in that there are no irregularities of that type or magnitude present in this case. In addition, Mother essentially alleges that DCS failed to provide her with services, and "failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009). In short, we find no infringement on Mother's right to due process as a result of DCS's, and by extension, the trial court's, actions.

# CONCLUSION

[21] Based on the foregoing, we conclude that Mother's right to due process was not violated by DCS's provision of services.

[22] Affirmed.

[23] May, J. and Altice, J. concur