# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 21 2020, 7:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kay A. Beehler
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of L.B., et al. (Minor Children)<br><br>and<br><br>L.P. (Mother),<br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br>*Appellee-Petitioner.* | October 21, 2020<br><br>Court of Appeals Case No. 20A-JT-1040<br><br>Appeal from the Knox Superior Court<br><br>The Honorable Gara U. Lee, Judge<br><br>Trial Court Cause Nos. 42D01-1909-JT-37 42D01-1909-JT-38 42D01-1909-JT-39 |

**Bailey, Judge.**

# Case Summary

[1] L.B. ("Mother") appeals the trial court judgment terminating her parental rights as to her children, C.B., L.B., and P.B. (collectively, "Children").[1] She raises two issues on appeal, but we address only the following dispositive, restated issue: whether the termination of her parental rights violated her due process rights because the Indiana Department of Child Services ("DCS") failed to provide her with needed services during the Child in Need of Services ("CHINS") proceedings.

[2] We affirm.

# Facts and Procedural History

[3] Mother and Father have three children, C.B. (born May 1, 2007), and twins L.B. and P.B. (born November 20, 2009). In May of 2018, DCS received a report that Mother was using drugs. DCS visited the home and removed Children when a urine screen indicated Mother's use of methamphetamine. Initially, Mother denied drug use, but she eventually admitted that "she was overwhelmed just taking care of the kids and the bills, and she slipped up and had used meth and took a pain pill for her back." Tr. at 40. On May 17, Children were placed with Father. However, one month later, Father "dropped [Children] off" at the home of Mother's brother and never returned to pick

---

[1] The parental rights of J.B. ("Father") were also terminated but he does not participate in this appeal.

them up. *Id*. at 88-89. Children have never been returned to the care of Father or Mother.

[4] On August 21, 2018, Mother entered into a "Stipulation for CHINS Adjudication," in which she stipulated that Children were CHINS because "mother requires assistance with substance abuse and obtaining and maintaining mental health services for the family, as well as assistance maintaining the children's school schedule and the home." Ex. Vol. I at 112.[2] Mother also stipulated that the following services were "necessary to remedy the reasons for DCS involvement: Drug screens and treatment as recommended; continuing mental health treatment as recommended; and ensuring the provision of a safe, stable environment free of abuse or neglect." *Id*. The court found that Children were CHINS.

[5] In a September 17, 2018, dispositional decree, the trial court ordered that Mother cooperate with DCS and participate in services, including: allowing DCS and service providers to visit Mother's home; enrolling in recommended programs; keeping appointments with DCS, service providers, and Children's Court Appointed Special Advocate ("CASA"); maintaining suitable, safe, and stable housing; maintaining stable income; not using illegal controlled

---

[2] All citations are to the CHINS and termination of parental rights documents for L.B., unless specifically noted otherwise, because the exhibits are substantially the same for all three of the children.

substances or alcohol; submitting to random drug screens; completing a substance abuse assessment and all recommendations; and attending visitations.

[6] Following a November 5, 2018, CHINS review hearing, the trial court found that DCS had offered and provided Mother with "family services," including "supervised visitation, therapeutic services, home based case management services, home-based therapy services, random drug screens, and participation in CFTMs [i.e., Child and Family Team Meetings]." *Id*. at 155. However, it found that Mother had "completely stopped participating in all services, except supervised visitation, and continue[d] to struggle with substance abuse." *Id*. at 154. The trial court noted that Mother had "failed to attend therapy with CFS [i.e., Children and Family Services, the agency assigned to provide Mother with substance abuse treatment] during the month of October." *Id*. The court further noted that Mother "had one visit with her home-based case manager from Raintree Consulting and that was only after the Raintree case manager did a drop-in visit to [Mother]." *Id*. The court found that Mother's "visitations [with Children] had been reduced to one two-hour visit per week, due to her cancelling at the last minute or failing to show up." *Id*. at 155. The court found that Mother had not cooperated with DCS and had not participated in any services other than some of the supervised visitations.

[7] Following the April 22, 2019, permanency CHINS hearing, the trial court found that DCS continued to offer services to Mother, but Mother had not remained in contact with DCS and had failed to consistently participate in services offered. Following a September 16, 2019, review hearing, the trial

court found that Mother had not cooperated with DCS and was not "in compliance with [Children's] case plan[s] as evidenced by [her] complete failure to take advantage of services, including visitation." *Id*. at 229.

[8] On September 16, 2019, DCS filed its petitions to terminate the parental rights ("TPR") as to Children. The trial court conducted a fact-finding hearing in the TPR cases on December 10, 2019, and February 6, 2020. Mother admitted at the hearing that Children need a stable home and a sober caregiver, and that she had not provided that home or been that caregiver. She agreed that she could not provide for Children's "safety, their wellbeing" as of the time of the termination hearing. Tr. at 140. Mother "[s]omewhat" agreed that DCS had provided services that would have allowed her to once again have custody of Children, but she agreed that she "didn't comply fully with those services." *Id*. at 30.

[9] In an order dated April 17, 2020, the trial court granted the TPR petition as to all three children. That order stated, in relevant part:

FINDINGS OF FACT

\* \* \*

21. The mother was offered random drug screens, parent aide services, home based casework, visitation, in-home therapy, and substance abuse treatment through Samaritan Center.

22. The mother failed to comply with providing random drug screens so that DCS could monitor compliance or lack thereof.

23. The mother cancelled or no-showed for home based caseworker services provided by the Department and was unable to complete any items on the referral due to noncompliance.

24. The mother's in-home therapy services through Children and Family Services were cancelled due to missed sessions prior to completion of services.

25. The mother missed many scheduled visits with the children to the extent that her visits were reduced to one time per month. The children were negatively affected when the mother missed visits.

26. According to Nicki Epperson who provided individual therapy to the girls and who facilitated therapeutic visits with the mother, the children wrote trauma narratives for the mother to read and the mother had not responded by letter to those narrative[s] as requested by the therapist. Ms. Epperson indicated that the kids are resentful regarding their parents and that [C.B.] has been refusing to attend visits with the mother.

27. It would be harmful for the children to be placed with either parent because therapeutically there is a concern that the parents would create more trauma.

28. The mother admitted that she was aware of the requirements outlined in the dispositional order and that she had failed to comply with many of them. Specifically,

she admitted to failing to keep in contact with DCS, failing to keep DCS apprised of changes to residence and employment, failing to maintain suitable housing, failing to complete referred programs, failing to keep appointments with providers, failing to submit to drug screens regularly, failing to refrain from drug use, and failing to attend visits consistently with her children.

29. Mother did indicate that she was "trying now" and had made recent positive changes in that she was currently working and attending a drug treatment program not referred by DCS. She claimed to be recently sober for one month. She admitted that she has not shown that she can support her kids and that she realized she was not what was best for them at the time of hearing but wanted an opportunity to change.

30. DCS's plan is for the children to be adopted by separate families, one a relative placement and the other a foster placement.

31. The CASA volunteer for the children, Cheryl Hugunin, was appointed in June of 2018. Cheryl believes it to be in the best interest of the children for the parent child relationships between the children and the mother and father to be terminated. She holds said position even in light of the fact that the children are not placed together. The children do attend the same school and have frequent contact. Due to the mother cancelling visits, Cheryl last saw the mother interact with the children in the Spring of 2019. Cheryl was never able to observe the children with their father. Cheryl informed the Court that the children were safe and stable in their current placements and that they would find permanency in those placements.

Appealed Order at 3-5.

[10] The trial court held that Mother's parental rights as to Children were terminated because there is a reasonable probability that the conditions which resulted in Children's removal will not be remedied, continuation of the parent-child relationships poses a threat to Children's well-being, and termination of parental rights is in Children's best interests. This appeal ensued.

# Discussion and Decision

[11] Mother maintains that the trial court's order terminating her parental rights violated her constitutional due process rights. Although Mother did not raise a due process argument in the trial court, we exercise our discretion to review that issue on appeal. *See In re D.H.*, 119 N.E.3d 578, 586 (Ind. Ct. App. 2019) (noting "we have discretion to address such [due process] claims, especially when they involve constitutional rights, the violation of which would be fundamental error"), *aff'd in relevant part on reh'g*, 122 N.E.3d 832 (Ind. Ct. App. 2019), *trans. denied.*

[12] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things: (A) that the child has been removed from the parent for at least fifteen of the most recent twenty-two months; (B) that there is a reasonable probability that the conditions resulting in the child's removal will not be remedied or the continuation of the parent-child

relationship poses a threat to the child's well-being; and (C) termination is in the best interests of the child.[3]  Ind. Code § 31-35-2-4(b)(2).

[13]  A parent's interest in the upbringing of his or her child is "perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s]."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.).  And the "involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed."  *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011).  Therefore, "the certainty of a trial court's decision to terminate a parent's parental rights to his or her child is paramount."  *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).  And we review such a decision under a "heightened standard" requiring clear and convincing evidence that termination is appropriate.  *Id.*  However, we will not reweigh the evidence or judge the credibility of the witnesses.  *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.*  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*

[14]  Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon.  Usually, when a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review.  *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d

---

[3]  We note that Mother does not challenge the sufficiency of the evidence supporting the decision to terminate her parent rights, and we discern no deficiency.

143, 147 (Ind. 2005).[4]  However, in this case, Mother does not challenge either the findings or specific conclusions; rather, she contends that the termination order must be reversed because DCS failed to provide her with necessary services and that failure denied her due process of law.

[15]  When the State seeks to terminate parental rights, "it must do so it in a manner that meets the requirements of due process." *In re J.K.*, 30 N.E.3d 695, 699 (Ind. 2015) (quotations and citations omitted).  The nature of the process due in proceedings to terminate parental rights is governed by a balancing of the "three distinct factors" specified in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976):  the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure.  *In re A.P.*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied*.

> The private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of his or her child.  And the State's interest in protecting the welfare of a child is also substantial.  Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions.

---

[4] First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment.  *Id.*

*In re S.L.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (citing *In re C.G.*, 954 N.E.2d at 917).

[16] In looking at the risk of error created by DCS's actions, we keep in mind that "due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014) (quotations and citations omitted). "[T]hese two proceedings—CHINS and TPR—are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter." *Id.* And "[a]ny procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *In re S.L.*, 997 N.E.2d at 1120; *see also Matter of C.M.S.T.*, 111 N.E.3d 207, 213 (Ind. Ct. App. 2018) (holding that "the chaotic and unprofessional handling" of a CHINS case violated the parents' due process rights, requiring reversal of the termination order). Thus,

> for a parent's due process rights to be protected in the context of termination proceedings, DCS must have made reasonable efforts to preserve and/or reunify the family unit in the CHINS case (unless the no reasonable efforts exception applies). What constitutes "reasonable efforts" will vary by case, and … it does not necessarily always mean that services must be provided to the parents.

*In re T.W.*, 135 N.E.3d 607, 615 (Ind. Ct. App. 2019), *trans. denied*.

[17] Here, we have identified no procedural irregularities in either the CHINS or TPR proceedings. Contrary to Mother's assertion, DCS did make reasonable efforts to preserve and/or reunify Mother and Children by offering Mother various services throughout the CHINS proceedings. DCS offered and/or provided Mother with drug screens, parent aide services, home based caseworker services, visitation, in-home therapy, and substance abuse treatment.[5] The record shows that it was Mother who failed to avail herself of those services. Her contentions to the contrary are merely requests that we reweigh the evidence and assess witness credibility, which we will not do. *See, e.g.*, *In re D.D.*, 804 N.E.2d at 265.

[18] The trial court did not enter the termination of parental rights order in violation of Mother's due process rights.

[19] Affirmed.

Bradford, C.J., and Vaidik, J., concur.

---

[5] Because the record establishes that DCS did, in fact, provide Mother with services throughout the CHINS proceedings—i.e., prior to termination of her parental rights—we do not address Mother's Equal Privileges and Immunities claim that Indiana Code Section 31-35-4-2(b)(2) "does not comport with Art. [1], § 23 of the Indiana Constitution" because it fails to require DCS to provide services prior to termination of parental rights. Appellant Br. at 19.