## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 14 2020, 9:21 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anthony C. Lawrence
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

K.E. (Minor Child)

   and

J.E. (Father),

*Appellant-Respondent,*

      v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

May 14, 2020

Court of Appeals Case No.
19A-JT-2738

Appeal from the
Henry Circuit Court

The Honorable Bob A. Witham, Judge

Trial Court Cause No.
33C01-1903-JT-32

**Altice, Judge.**

# Case Summary

[1] J.E. (Father) appeals from the involuntary termination of his parental rights to his minor child, K.E. (Child), claiming that his due process rights were violated during the CHINS and termination proceedings.

[2] We affirm.

# Facts & Procedural History

[3] Father and A.C. (Mother)[1] are the biological parents of Child, born in February 2013, and Mother was the custodial parent. At the time of Child's birth, Father was on probation for a November 2012 conviction for Class D felony possession of a controlled substance. Thereafter, Father was convicted, following guilty pleas, of Level 6 felony possession of methamphetamine in March 2016, Level 6 felony forgery in May 2016, and Class B misdemeanor visiting a common nuisance in November 2016.[2] In July 2017, Father was charged with Level 6 felony theft and Class A misdemeanor theft.

---

[1] Mother's parental rights were also terminated but she does not participate in this appeal. Accordingly, we will focus on the facts related to Father.

[2] For the possession of methamphetamine conviction, Father was sentenced to two years and 180 days at the Indiana Department of Correction (DOC), with two years suspended and the 180 days to be served as a direct commitment to the Henry County Jail. For the forgery conviction, Father was sentenced to 730 days at the Henry County Jail, with 692 suspended, to be served concurrently with the possession of methamphetamine conviction. For the visiting a common nuisance conviction, Father was sentenced to 120 days at the Henry County Jail.

[4] In November 2017, Indiana Department of Child Services (DCS) received a report that Child was staying with maternal grandparents and that Mother and a relative, Stacy, had been in and out of the home and were using illegal substances and alcohol. At the time, there was a safety plan in place under which Mother's mother (Grandmother) was not to allow Stacy into the home or be around Child if Grandmother observed Stacy to be under the influence. On November 7, 2017, DCS assessment case manager Kimyi Taylor (FCM Taylor), accompanied by a law enforcement officer, went to the home and spoke to Grandmother. Child was present in the home as well.

[5] FCM Taylor observed that Grandmother's hand was bandaged, which Grandmother reported was the result of an injury she sustained during a physical altercation with Mother that occurred earlier in the week and in the presence of Child. FCM Taylor smelled burnt marijuana in the home, and Grandmother admitted she had smoked marijuana within the last hour. Grandmother was at that time the only caretaker in the home for Child. Neither Grandmother nor DCS was able to make contact with Mother.

[6] From Grandmother's home, FCM Taylor called Father on his cell phone at approximately 7:00 p.m. and reached him at work in Connersville, which was approximately 45 minutes away. According to FCM Taylor, "upon hearing about what was going on with [Child,] [Father] said that he would leave Connersville and come directly to the DCS office" to take custody of Child. *Transcript* at 43. FCM Taylor stayed at the office with Child until approximately 11:00 p.m. but Father never arrived or called. At some point

that evening, Mother came to the DCS office and was angry and aggressive. FCM Taylor suspected that Mother was "under the influence," but Mother refused to submit to a drug screen. *Appellee's Appendix* at 3. Child was placed that night with Father's aunt (Aunt). Father was also living at Aunt's residence at that time.

[7] On November 8, 2017, DCS filed a child in need of services (CHINS) petition. Father did not appear at a number of initial hearings that were called and reset a number of times between November 2017 and February 2018. Father appeared at a hearing on February 13, 2018 but failed to appear at others in the following weeks. On March 13, 2018, the trial court received correspondence from Father requesting appointment of counsel, and on March 15, counsel filed an appearance on Father's behalf and represented Father throughout the remainder of the CHINS and termination proceedings. On June 4, 2018, Father pled guilty to the pending counts of theft and was sentenced to two years at the DOC, with one year suspended and one year to be served as a direct commitment to the Henry County Community Corrections program.

[8] On June 5, 2018, the court held a fact-finding hearing, where Father appeared with counsel, and the court adjudicated Child a CHINS. On June 21, 2018, the court held a dispositional hearing, at which Father appeared with counsel. The trial court adopted in open court recommendations of DCS, and both parents were ordered to comply with DCS services, including: remain in contact with the FCM, notify DCS of any arrest or criminal charges, not use or sell any illegal controlled substances, obey the law, submit to drug screens, participate in

a parenting assessment and a substance abuse assessment, maintain safe and reliable housing, and secure and maintain stable income. On July 11, 2018, the trial court issued a written dispositional order consistent with the orders it had issued at the June 21 hearing.

[9] Meanwhile, on July 8, Father cut off his home detention ankle bracelet, and, on July 11, 2018, Father was charged with Level 6 felony escape. Also on July 11, Father was charged under another cause number with three Level 6 felonies – possession of methamphetamine, unlawful possession of syringe, and maintaining a common nuisance-controlled substance – for acts committed on June 26, 2018, which was five days after the dispositional hearing. On July 12, 2018, Father was arrested and has been continuously incarcerated since that time.

[10] Father was scheduled for drug screens with Redwood Toxicology on June 29, 2018, July 2, 2018, and July 13, 2018. After Father failed to submit to screens on those dates, Redwood canceled Father's participation for non-compliance. On August 31, 2018, Father pled guilty to the possession of methamphetamine and the escape charges. The pleas were accepted by the court in September 2018, and he was sentenced to 548 days at the DOC for each of the two convictions, to be served consecutive to each other. The escape sentence was also ordered to be served consecutive to the felony theft sentence. Father's projected release date is in June 2020.

[11]     In October 2018, placement of Child was changed from Aunt to Mother's niece (Niece), where Child has remained.  A permanency hearing was held on January 23, 2019, at which Father appeared by phone and by counsel.[3]  On January 31, 2019, the court issued a permanency order with a concurrent plan of reunification and adoption.  The order memorialized that, at the hearing, Father told the court that he had been incarcerated since the day after the dispositional order was written and that he had not had an opportunity to participate in the services recommended by DCS, but had participated in other programming while incarcerated.  Father told the court that he planned to participate in substance abuse programming and would try to participate in parenting classes as well.

[12]     On March 25, 2019, DCS filed a petition to terminate Father's parental rights.[4] Thereafter, on April 22, 2019, FCM Kimberly Thornberg filed a progress report in the CHINS case indicating that she had visited Child once per month from January through April 2019, Child was living with a relative and had no contact with Mother, and Father was incarcerated.  The report also indicated that Child was in kindergarten, was intelligent and happy, was in good health, and participated in softball and other activities.  The report indicated that there

---

[3] Mother consented at the hearing to the termination of her parental rights to Child.

[4] We note that, although Father was represented by counsel, the record reflects that he filed several pro se pleadings in April 2019, including a pro se appearance and a pro se Response/Objection to the termination of his parental rights.

"were no further services recommended" for Mother or Father at that time. *Exhibit Vol*. at 136 (Exhibit 14).

[13] In August 2019, the trial court, on Father's request, ordered Heritage Trail Correctional Facility (HTCF), where Father was incarcerated, to submit a progress report to the court, which HTCF did on August 23, 2019. The HTCF progress report reflected that Father had completed the Thinking for a Change program and had been referred to other programs including Business Technology. The report also showed that Father had been found guilty of conduct violations including engaging in unauthorized financial transactions, fighting, and unauthorized possession or destruction of state property, all occurring in March 2019, and impairment of surveillance, occurring in June 2019.

[14] The termination hearing was held on September 17, 2019. FCM Taylor testified that she was involved only in the assessment aspect of the case, which lasted about two weeks. She testified that she never received a call from Father during her time on the case, but noted that Father had her phone number because she had used her cell phone to call Father on the night Child was removed. She stated that during the assessment period, she met with Aunt and Child at Aunt's home on two or three occasions but Father was not present.

[15] Aunt testified that around the time of Child's removal in November 2017, Father was living with her, and he had lived with her on other occasions as well. He sometimes helped with utilities but did not pay rent. Aunt described

that Father had a "typical" and "good" relationship with Child. *Transcript* at 57. She said that, during his incarceration, he regularly called her and would ask about Child. Aunt testified that, at Father's request, she had not told Child that Father was incarcerated and would instead tell Child that Father was "at work." *Id*. at 62. She stated that for about twenty years, Father had struggled with drugs and alcohol at different periods of his life.

[16] Niece testified that Child had been living with her for almost a year and that, during that time, Father never contacted her to reach Child and that Child never asked about Father. She testified that she was willing to adopt Child and believed it was in Child's best interest to be with her.

[17] The director of the Henry County CASA office, Susan Stamper, testified that she believed it was best for Child to remain where she was currently placed, noting that "for the first time" Child had stability and continuity, which she did not have when placed with Mother. *Id*. at 68. Stamper acknowledged that she had not met or talked to Father but observed that Father had "not provided that stability" since she became involved in the case.[5] *Id*. at 69. When asked on cross-examination whether Father was aware that she was involved in the case, she replied, "He should have been" because her reports "usually go to counsel." *Id*. at 70.

---

[5] The record reflects that the court appointed a CASA in November 2017 shortly after Child was removed, but Stamper did not specifically testify as to when she became involved in the case.

[18] FCM Thornberg testified that she had been working on the case for eight months, after receiving it from a prior FCM who moved. Father was already incarcerated when she began on the case. FCM Thornberg stated that she did not receive any calls or letters from Father and that any such communication he might have sent to the prior FCM would have been directed to her. FCM Thornberg acknowledged that she did not notify Father when she took over the case or contact him at HTCF, nor did she contact the facility about setting up visits for Father. FCM Thornberg recommended termination of Father's parental rights and adoption.

[19] Father, who was incarcerated at the time of the hearing, also testified. He stated that he had been part of Child's life "off and on" for three and one-half to four years of her six years, and he asked the court not to terminate his parental rights and keep Child with Niece to allow him to participate in services and "make things right with [his] daughter." *Transcript* at 91, 96. Father stated that his plan for employment was to get his union job back or find other union work, although he conceded that he had not maintained active status. He acknowledged that during the CHINS case he was convicted of three felonies (theft, escape, and possession of methamphetamine) and that he had attempted no contact with Child since his incarceration in July 2018. Father testified that he did not want Child to know he was incarcerated and that, at his request, family members including Grandmother and Aunt had been telling Child that he was at work. Father stated that every Sunday he telephones Grandmother and Aunt and inquires about Child and her activities.

[20] Father stated that when he received a call from FCM Taylor on the night Child was removed, he told her that he did not have a driver's license and would attempt to find someone to drive him to the DCS office, but he was unable to secure a ride and returned to Aunt's the next day. He acknowledged that he did not call or contact FCM Taylor that night or at any time during her two weeks on the case. Father testified that DCS had not contacted him during his incarceration to discuss the case or arrange visitation but that he had received five or six DCS progress reports while incarcerated. Father acknowledged that he did not notify DCS of his arrest or incarceration and that he had not attempted to contact DCS.

[21] Regarding drugs and alcohol, Father testified that he currently did not have a problem with substances, but he did in the past. Father admitted that he attended AA and NA in 2009, but that he again used drugs and alcohol. Father stated that in 2015, as part of probation, he received treatment but acknowledged he consumed again, stating, "I have used but I didn't relapse." *Transcript* at 38. When asked about dates of his consumption of illegal substances, Father stated that the only time he consumed illegal substances were the dates that resulted in criminal charges. Later in his testimony, Father assured the court that he is "absolutely" willing to participate in therapy and submit to drug screens as set forth in the dispositional order. *Id* at 94.

[22] On October 22, 2019, the trial court issued an order terminating Father's parental rights. The court's findings and conclusions included the following:

8.  [Father] failed, without explanation or further contact with FCM Taylor, to come to or contact the DCS office after having indicated he was on his way from an adjoining county to collect her on the evening of detention.

\* \* \*

12. Father had the knowledge of both the CHINS case's existence and of how to involve himself in it but chose to not do so for several months after [Child] was detained.

\* \* \*

17.  [Father] has violated the terms of the dispositional order in several ways, including but not limited to: failure to contact the Family Case Manager each week in person, by letter, email or telephone; failure to notify the Family Case Manager of any arrest or criminal charges; failure to complete the substance abuse assessment within 30 days; failure to maintain suitable safe and stable housing for the child; failure to maintain a stable and legal source of income adequate to support the child; not use, consume... trade... or sell any illegal controlled substances; obey the law; ensure that the child be engaged in home-based counseling; submit to random drug screens; and comply with substance abuse evaluation and screens through his criminal case sentencing order.

\* \* \*

21. [Father] has an extensive history of criminal convictions that occurred both before and after [Child]'s birth.

\* \* \*

29. [Father] has a long-established history of substance abuse including convictions in cases from 2008, 2012, 2016, and 2018 on substance-related charges.

30. [Father] has been ordered to participate in substance abuse treatment by the criminal courts.

31. Nevertheless, [Father] testified at hearing that he is not an addict and does not have an addictive personality.

32. Father also testified that since February 5, 2013, he had consumed an illegal substance only on the individual days about which he was criminally charged and convicted.

33. The Court finds it not credible that [Father] used substances illegally only on the specific individual dates for which he was subsequently charged and convicted.

34. [Father]'s inability or unwillingness to candidly disclose the full extent of his substance abuse disorder reflects that he, while possibly not using controlled substance at this time, is unlikely to maintain long-term sobriety upon his release from imprisonment.

* * *

40. Father paid no rent at [Aunt's] property, although on 2 or 3 occasions over his seven months' stay he gave her money toward utilities.

41. [Father] has never during the pendency of the CHINS case provided housing for [Child]; instead, [Aunt] allowed him to stay at her residence and accepted placement of [Child] after she was detained from her mother.

\* \* \*

44. Father has not maintained consistent, reliable employment either before the case arose or after its filing.

\* \* \*

46. [Father] was ordered to comply with substance abuse through Redwood Toxicology. After his failure to submit a sample on June 29, 2018, July 2, 2018, and July 13, 2018, Redwood Toxicology canceled his screening visits due to his noncompliance.

47. Father has made no attempt at communication with DCS family case managers, and [Child]'s case file contains no letters or telephone messages from him seeking services while he is incarcerated.

48. [Father] has received copies of progress reports on his CHINS case and has attended case hearings by telephone since his current incarceration.

\* \* \*

54. [Father] has not spoken with his daughter in the over 15 months that he has most recently been incarcerated.

55. Father prevailed upon his family and friends . . . to lie to [Child] by telling her that Father has been away for work, rather than telling her truthfully that he is and has been for the period incarcerated.

56. [Father] had funding and ability to contact relatives by telephone from prison but has chosen to not speak with [Child] during this current incarceration.

\* \* \*

62. Father not only did not request visitation to maintain his relationship with [Child] during his incarceration, he actively avoided any direct contact to reinforce his ruse that he is at liberty.

63. The Court, while acknowledging the statutory amendment enacted on July 1, 2019 regarding incarcerated parents, finds it of minimal relevance to this matter in that it was enacted almost two years after [Child] was detained and several months after the Termination action was filed.

64. The Court finds that the law controlling to this case is that which was in place at the time of its filing.

65. While [Father] raises concerns about not having be[en] provided Child and Family Team Meetings, the Court finds that any deficit in service offerings is directly tied to his own failure to participate[.]

*Appellant's Appendix Vol. 2* at 111-16.

[23]     The court determined that there is a reasonable probability that the conditions that resulted in Child's removal or the reasons for the placement outside the parent's home will not be remedied, that it is in Child's best interests to terminate Father's parental rights, and that there is a satisfactory plan for her care, namely adoption by Niece.  Father now appeals.

# Discussion & Decision

When reviewing the termination of parental rights, we consider the evidence in the light most favorable to the prevailing party, and we will not reweigh the evidence or judge the credibility of the witnesses. *Matter of M.I.*, 127 N.E.3d 1168, 1170 (Ind. 2019). To prevail, the challenging party must show that the court's decision is contrary to law, meaning that the probative evidence and reasonable inferences point unerringly to the opposite conclusion. *Id.*

It is well recognized that a parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things: (A) that the child has been removed from the parent for at least fifteen of the most recent twenty-two months; (B) that there is a reasonable probability that the conditions resulting in the child's removal will not be remedied or the continuation of the parent-child

relationship poses a threat to the child's well-being; and (C) termination is in the best interests of the child. Ind. Code § 31-35-2-4(b)(2). "As a matter of statutory elements, it has been established that DCS is not required to provide parents with services prior to seeking termination of the parent-child relationship." *In re T.W.*, 135 N.E.3d 607, 612 (Ind. Ct. App. 2019), *trans. denied*.

[27] When the State seeks the termination of a parent-child relationship, it must do so in a manner that meets the requirements of the Due Process Clause. *In re H.L.*, 915 N.E.2d 145, 147 (Ind. Ct. App. 2009). "Due Process has never been defined, but the phrase embodies a requirement of 'fundamental fairness.'" *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011). Due process in parental rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting the use of the challenged procedure. *Id.* The private interest affected by the proceeding is substantial – a parent's interest in the care, custody, and control of his or her child – and the State's interest in protecting the welfare of a child is also substantial. *S.L. v. Indiana Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013). Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions. *Id.* This court has observed,

> For a parent's due process rights to be protected in the context of termination proceedings, DCS must have made reasonable

efforts to preserve and/or reunify the family unit in the CHINS case (unless the no reasonable efforts exception applies). What constitutes "reasonable efforts" will vary by case, and . . . it does not necessarily always mean that services must be provided to the parents.

*In re T.W.*, 135 N.E.3d at 615.

[28] Here, Father does not challenge the sufficiency of the trial court's findings or its conclusions.[6] Rather, Father argues that he "has been deprived of his due process rights" due to "significant procedural irregularities in the CHINS proceedings which created a risk of the erroneous filing of a petition to terminate Father's parental rights." *Appellant's Brief* at 19. He also asserts that his "substantive and procedural due process rights were violated where [DCS] denied [him] the opportunity to maintain contact throughout the case during his incarceration and provide reasonable services to reunify the family."[7] *Id.* at 5. He asks that we reverse the termination of parental rights order, that the CHINS proceeding resume in a manner consistent with due process, and that

---

[6] Father has thus waived any claim that the termination was not supported by sufficient evidence. *See A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 n.4 (Ind. Ct. App. 2013) (noting that where parent fails to raise specific, cogent argument challenging trial court's termination conclusions, those challenges are waived on appeal), *trans. denied*.

[7] Father indicates that his due process claim is pursuant to both the federal and state constitutions. Our courts have recognized that in the termination context the due process analysis under each constitution is the same. *Matter of D.H.*, 119 N.E.3d 578, 586 n.16 (Ind. Ct. App. 2019), *modified on reh'g* 122 N.E.3d 832, *trans. denied*.

he be given an opportunity to engage in appropriate services to assist in reunification with Child. *Id.* at 8.

[29] We begin by examining the time period that preceded his July 2018 incarceration. There is no dispute that Father was aware of Child's removal in November 2017 and of the ensuing the CHINS proceedings. He did not come to the DCS office to pick up Child on the night of her removal or call FCM Taylor to explain any circumstances preventing it. Nor did he contact FCM Taylor in the two weeks that followed. He did not appear for initial hearings in November 2017 through January 2018, eventually appearing in court for a hearing on February 13, 2018. He was in attendance at the June 21, 2018 dispositional hearing where the trial court adopted DCS recommendations and ordered parents to follow the same. Less than two weeks later, on or around July 8, Father cut off his home detention ankle bracelet and left without permission. On July 11, he was charged with felony escape, and, among other things, possession of methamphetamine which stemmed from acts committed on June 26, days after the dispositional hearing. Father was arrested and incarcerated on July 12 and has remained so since that time. Father acknowledged that he did not contact DCS or attempt to participate in any DCS services before he was arrested.

[30] Turning to the period after his incarceration, we reject Father's claim that he was denied "the opportunity" to maintain contact with Child and was thus denied due process. *Appellant's Brief* at 5, 18. Rather, we agree with DCS that Father "chose to avoid Child instead of maintaining a bond with her."

*Appellee's Brief* at 27. That is, Father did not desire to exercise parenting time with Child while he was in prison because he did not want Child to know he was incarcerated out of concern that "that's going to change up how she views me." *Transcript* at 91. To perpetuate the falsehood that he was not in prison, Father persuaded family and friends to tell Child that he was at work. Father agreed that he did not contact Niece, with whom Child had been living for almost a year, or otherwise send any mail, cards, or communication to Child. These facts do not support his claim that he was denied the opportunity to have contact with Child.

[31] Father also asserts that, during his period of incarceration, DCS failed to provide reasonable services to him to reunify him with Child. While DCS is generally required to make reasonable efforts to preserve and reunify families during CHINS proceedings, Ind. Code § 31-34-21-5.5, "the CHINS provision is not a requisite element of our parental rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d at 148 n.3 (citing *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000)). Furthermore, we have found that a failure to provide services to a parent while incarcerated does not necessarily result in deprivation of due process. *See In re H.L.*, 915 N.E.2d at 148 (finding no due process violation where "the absence of services was due to Father's incarceration" and he "[did] not point to any evidence that he specifically requested visitation or other services").

[32] In addition to a lack of offered services, Father asserts that DCS failed to maintain meaningful contact with him during the period of his incarceration, arguing, "No FCM . . . encouraged [Father's] involvement, nor communicated and engaged in planning with [him]" such that he was not "afforded an opportunity to be involved in all aspects of the planning and decision-making progress." *Appellant's Brief* at 17. He maintains that, due to such procedural failings, his case is similar to *In re D.H.*, where this court accepted a mother's argument that DCS mishandled her case to such an extent that it denied her due process of law and reversed the trial court's termination of the mother's parental rights "[i]n light of DCS's significant and admitted procedural failings in this case[.]" 119 N.E.3d at 591. We find *D.H.* distinguishable. First, the mother in that case was not incarcerated, as is Father. Second, and in contrast to the present case, the mother repeatedly requested and expressed willingness to participate in services. Here, Father did not ever contact DCS, purposely did not maintain contact with Child, and received a number of conduct violations while incarcerated.

[33] To the extent that Father suggests he did not know how to reach DCS or his FCM, we disagree. Father acknowledged that, while incarcerated, (1) he received five or six DCS progress reports, (2) he read them thoroughly, and (3) each report identified the FCM. As this court has observed, "[T]he responsibility to make positive changes will stay where it must, on the parent[,]" and "[i]f the parent feels the services ordered by the court are inadequate to facilitate the changes required for reunification, then the onus is

on the parent to request additional assistance from the court or DCS." *Prince v. Indiana Dep't of Child Servs.*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007).

[34]   While we recognize that procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights, we do not find that any procedural irregularities in this case rose to the level of a deprivation of Father's due process rights. *See C.A. v. Indiana Dep't of Child Servs.*, 15 N.E.3d 85, 93 (Ind. Ct. App. 2014) (no due process violation where the only procedural irregularity argued by Mother was that she did not receive or sign a case plan[8] and "[t]he record indicates that it was not Mother's lack of knowledge or direction as to what she needed to do to get her children back, but rather her lack of participation"); *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 376-77 (Ind. Ct. App. 2006) ("[A]ny procedural irregularities that occurred in this case are largely attributable to the fact that Castro has been incarcerated throughout the proceedings. And we cannot say that those flaws that are not attributable to Castro's incarceration rise to the level of a deprivation of Castro's due process rights."), *trans. denied*; *compare Matter of C.M.S.T.*, 111 N.E.3d 207, 213-14 (Ind. Ct. App. 2018) (procedural irregularities in the

---

[8] In his case, Father likewise argues that he did not receive a case plan. However, DCS documents in the record refer to a "case plan", indicating that one existed, and FCM Thornberg testified that, at some point, she had prepared one, although could not testify to specifics. *See Exhibits Vol.* at 136 (April 22, 2019 Progress Report) and 146 (Nov. 26, 2018 Order Approving Permanency Plan); *Transcript* at 75. Like our colleagues in *C.A.*, we "caution the DCS to be more cognizant of the statutory framework by which it is to abide, which includes providing a case plan to each parent," but we do not conclude that, in this case, any failure resulted in a procedural irregularity so egregious that Father was denied due process of law." 15 N.E.3d at 93.

CHINS case—including multiple FCMs, inappropriate behavior by FCMs, and apparent bias of FCMs—contributed to parents' non-compliance such that termination of their parental rights amounted to a denial of their due process rights).

[35] Judgment affirmed.

Bailey, J. and Crone, J., concur.