

# IN THE
# Court of Appeals of Indiana

In the Matter of the Termination of the Parent-Child Relationship of A.W. (Minor Child), J.W. (Father), and T.W. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child Services, et al.,

*Appellees-Petitioners*



FILED
Dec 08 2025, 10:24 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

December 8, 2025

Court of Appeals Case No.
24A-JT-3052

Appeal from the Marion Superior Court

The Honorable Duane Merchant, Judge

Trial Court Cause No.

49D09-2208-JT-6139

**Opinion by Judge DeBoer**
Judge Weissmann concurs.
Judge Bradford dissents with separate opinion.

**DeBoer, Judge.**

## Case Summary

[1] J.W. (Father) and T.W. (Mother) [collectively, Parents] appeal an order terminating their parental relationship with their child, A.W. (Child). They raise one dispositive issue: in a proceeding to terminate a parent-child relationship (TPR), whether the Indiana Department of Child Services (DCS) can refuse to answer a discovery request asking it to disclose the names and contact information of the child's foster parents. We hold that if testimony from the foster parents would be admissible at the termination hearing—or if the foster parents have information that might lead to the discovery of admissible evidence—their names and contact information are discoverable under Indiana Trial Rule 26. Accordingly, DCS cannot refuse to provide that information under such circumstances without infringing on a parent's entitlement under Indiana Code section 31-32-2-3(b)(2) "to obtain witnesses or tangible evidence by compulsory process[.]"

[2] Here, Parents argue that by denying their motion to compel DCS to disclose the names and contact information of the numerous foster parents with whom

Child was placed throughout these proceedings, the trial court "den[ied] [them] the opportunity to investigate, discover, identify, and call witnesses[.]" Mother's Brief at 31. Because DCS should have been compelled to identify Child's foster parents under the circumstances of this case, we reverse and remand for further proceedings.

## Facts and Procedural History

[3] Child was born to Parents in November 2009. In October 2017, when Child was seven years old, a DCS case worker visited Parents' home to investigate a report of abuse and neglect. In the home, the case worker observed, among other things, "trash everywhere, feces and urine on the floor, food on the floor[,] [] stagnant water in the toilet and in the bathtubs, [] clutter everywhere, . . . dirty clothing in every room[,] [h]oles in the walls, [and] exposed wires." Transcript Vol. 4 at 24. Father agreed to take a drug screen, which came back positive for methamphetamine and marijuana.

[4] DCS filed a petition alleging that Child was a child in need of services (CHINS). The basis of that petition was that Parents had failed to provide Child with a safe environment free from substance abuse. At an initial hearing held the same day the petition was filed, the trial court ordered Child removed from Parents' home and placed in DCS's custody.

[5] In February 2018, Mother admitted that she "need[ed] assistance to maintain stable housing" and, for that reason, Child was a CHINS. Exhibits Vol. 1 at 47.

Father "waived [his] right to [] fact-finding . . . based on the admission of the other parent." *Id.* at 48. The trial court issued a dispositional order providing that Child "shall remain detained and in the custody of" DCS and the plan for permanency was reunification with Parents. *Id.* at 55. At the same time, it issued a parental participation order requiring Parents to participate in a home-based case management program, submit to random drug and alcohol screens, and engage in substance abuse assessments if they tested positive for alcohol or drugs.

[6] During the CHINS proceedings, Child was placed with seven foster families in as many years and spent some time in respite care while awaiting new placements. Many of Child's placements ended poorly. For example, in August 2018, DCS placed Child with a woman who was an acquaintance of Child's maternal aunt. Though this placement started out well, Child eventually began to exhibit problematic behaviors. On one occasion, while on a road trip with the foster family, Child recorded a video of herself masturbating in the back seat of their car. At other times, Child hit her foster parents, threw things, and once tried to exit a moving vehicle. Eventually, the foster parents requested that Child be removed from their care because they felt they could not meet her needs.

[7] By 2019, Child had been placed with her fourth foster family. At a permanency hearing in December of that year, Child's guardian ad litem (GAL) recommended that the trial court change Child's permanency plan to adoption

because Parents had minimally complied with services and were uncooperative with DCS, and Child was supposedly doing well in foster care. The court ordered that based on Parents' "continued failure to address their substance abuse issues, . . . it [was] in [Child's] best interests for the plan to change from reunification to adoption." *Id.* at 82.

[8] Child continued to exhibit behavioral issues while living with her fourth foster family and was moved to a fifth placement in February 2020. Child was sexually molested while in her fifth placement, and DCS placed her with her sixth foster family in January 2021. There, Child continued to exhibit distressing behaviors, such as pulling her hair out, hitting her head against the floor or wall, calling herself names, and threatening to harm herself. During this time, Child had two acute stays in the hospital because she was struggling with her mental health and was having issues getting on the correct psychiatric medication. The sixth placement ended after one year, and Child stayed in a respite home for two months while awaiting a new placement.

[9] DCS placed Child with her seventh and current foster family in March 2022. Child generally did well in this placement and bonded with her foster parents and their adopted daughter. Child's current foster parents believe they can provide for her mental and physical health and her educational needs, and they want to adopt her. Child has similarly expressed that she wants to be adopted by them.

[10] In August 2022, DCS filed a TPR petition. During the TPR proceedings, Father served a discovery request upon DCS asking it to disclose the names of and contact information for each of Child's foster placements. He also informally requested that information from a representative of Kids' Voice of Indiana who had been appointed Child's GAL. After DCS objected to the request and the GAL refused to provide the information without a court order, Father filed a motion to compel, arguing:

> 6. [Child] has been in eight[1] [] distinct foster placements and also respite care.
>
> 7. The most recent report filed . . . by DCS states: "[Child] suffered no physical injuries prior to removal. [Child] displayed no known psychological or social deficits or limitations prior to her removal."
>
> 8. Clearly, [] Child's placement in foster care has caused substantial change[s] in Child's psychological and social deficits and limitations.
>
> * * *
>
> 10. There have been allegations of sexual abuse during foster placement resulting in a change of placement.

---

[1] On appeal, the parties agree that Child was in fact placed in seven, not eight, foster homes.

11. Father is entitled to investigate the appropriateness of these placements through interviews and depositions and subpoenas for testimony at the termination trial.

Mother's App. Vol. 2 at 105-06.  In opposition to that motion, DCS asserted:

1. Indiana Code 31-27-2-12 mandated DCS to create a Foster Parent Bill of Rights[.][2]

* * *

3. [The Foster Parent Bill of Rights] states that [] [f]oster [p]arents have a right to safety and privacy.

* * *

5. Because [f]oster parents expect safety and privacy, providing names and addresses to biological parents would [] deter them [from] becoming foster parents.  Providing the names and addresses is contrary to public policy, in general.

*Id.* at 111.

---

[2] Indiana Code section 31-27-2-12(a) requires DCS to "develop and update periodically a statement that describes the rights of a foster parent that must be known as the 'foster parent bill of rights.'"  As required by that statute, DCS has promulgated a set of policies known as the Foster Parent Bill of Rights, which provides, in part, that "[f]oster parents have the right to . . . [h]ave information concerning the foster family kept confidential, except when release is required by law[.]"  Mother's App. Vol. 2 at 110.

[11] At a hearing on the motion to compel, Mother's counsel joined in the motion and argued:

> Parents have a due process right to fully investigate and understand the situation so we can fully develop a case in our arguments. This is a case where [Parents] have been prevented by court order from seeing [Child] for several years and during the intervening time period things have changed dramatically. [Parents'] previously close relationship with [Child] has morphed into [Child] indicating she never wants to see them again. A child with no psychological problems is now on numerous psych meds. Parents don't fully understand what happened that caused their visits to be suspended in the first place and if we are going to be able to argue that [P]arents['] rights should not be terminated in this matter, . . . we need and [Parents] have a right to understand what happened and to fully develop that case . . . and we need to be able to reach out to the foster parents in order to do that.

Supplemental Tr. Vol. 2 at 5. Father's counsel added that Parents did not "want to go and invade the privacy of foster parents" but rather there were "legitimate specific issues that ha[d] developed over the course of this case" that entitled Parents to conduct discovery relating to Child's foster placements. *Id.* at 6.

[12] In response to these arguments, DCS reiterated its belief that the Foster Parent Bill of Rights protects foster parents' names and contact information from disclosure in discovery. It also raised policy concerns, arguing that "there are kids that need placement that we cannot find placement for. So, . . . it's really

important that we . . . protect [foster parents'] privacy because . . . this could have a far reaching [sic] impact on . . . an area that's already difficult to find placement." *Id.* at 6-7. DCS further alleged that Parents had "crossed a boundary" with two of Child's foster placements by supposedly sending a package to one of them and reaching out to another on social media. *Id.* at 7. Based on these incidents, DCS argued it would not be "a good idea" for it to disclose the names and contact information for all of Child's foster placements. *Id.* Finally, DCS suggested that any information that Parents could glean from Child's foster parents was irrelevant to the TPR proceedings because "it's not part of any petition or TPR statute that DCS has to do a good job and everybody knows that the State shouldn't be raising kids. So . . . it's not relevant. What's relevant is what [Parents] have done or not done." *Id.* at 10-11.

[13] At the conclusion of the hearing, the trial court asked the parties to submit briefs outlining their positions. It ordered DCS and the GAL to file their briefs on or before June 2, 2023, and gave Parents until June 7 to file their responses. DCS and the GAL filed their submissions on June 1 and 2, respectively. On June 6—before Parents had filed their briefs and one day before their deadline to do so had passed—the court signed a one-sentence order denying the motion to compel. The following day, Parents filed a joint motion asking the court to reconsider its denial, arguing it should have waited for them to submit their briefs before ruling on the motion. At the same time, Parents submitted their

briefs. The court granted the motion to reconsider on June 8 and indicated that "a new Order w[ould] be issued once [it] ha[d] the chance to review [Parents'] Memos." Mother's App. Vol. 2 at 146. However, later that same day it re-issued its prior order denying the motion to compel, which was still dated as having been signed by the court on June 6.

[14] Before the termination hearing, Parents filed a motion asking that "the [trial] court exclude evidence regarding [Child's] time in foster care, including . . . testimony by any foster care placements[.]" *Id.* at 181. They argued that the presentation of such testimony would be unfair because Parents' counsel had been unable to "fully obtain information regarding [Child's] health, behavior, mental status, and well-being in foster care as they [could not] contact foster placements." *Id.* at 180. They also asserted that testimony from Child's foster parents was inadmissible because DCS had argued in opposition to the motion to compel that any information Parents could learn from them in discovery was "wholly irrelevant to these proceedings[.]" *Id.* (internal record citation omitted). The court did not issue a written order on that motion.

[15] The trial court held a twelve-day termination hearing over a thirteen-month period on June 29, July 27, September 21, October 26, November 9, November 30, and December 7, 2023; and February 8, February 15, April 16, May 23, and August 2, 2024. On the first day of the hearing, Father's counsel renewed Parent's request for information regarding Child's foster placements and mentioned that the court had yet to rule on the motion to exclude. He also

noted that he had "subpoenaed both [] DCS and [the GAL] to provide . . . these people in person" at the hearing, but the subpoena did not specifically name who DCS and the GAL were being asked to produce because Parents "d[id not] know their names[.]" Tr. Vol. 2 at 39. The court denied the motion to exclude and, with respect to the renewed motion to compel, stated it would "stand by [its] earlier ruling[.]" *Id.* at 45.

[16] Before and during DCS's presentation of evidence, Parents repeatedly objected to testimony relating to Child's foster placements, including testimony from two of Child's foster parents. For example, at the start of the hearing, Mother objected "to calling the foster parents who are on the list for today[.]" *Id.* at 46. The trial court did not issue a clear ruling on Mother's objection, and when DCS called one of Child's current foster parents, Father objected to her testimony on the same grounds that Mother had raised earlier. The court denied the objection, stating, "I'm showing this as [Parents] . . . continuing to [] preserve their objection and make sure the record is clear." *Id.* at 56.

[17] When DCS asked that foster parent "[w]hat [Child [was] like when she first came to live with" her, Parents objected, stating, "[T]hat's why we want to talk to the other families for that very reason[,]" and arguing:

> Your Honor, . . . we argued that it is relevant that foster placement and how [Child] conducted herself in foster placement is relevant and [] DCS and [the GAL] said it is not relevant, and therefore has excluded [] prior placements from the court's consideration. . . . [T]hey're hiding from the court some essential

> evidence we believe for the court to make a decision based on all
> the evidence and . . . of you hearing the whole story, and the
> reason we're objecting is because you're only going to hear part
> of the story, and we just don't think that's fair. [] I think it's a
> denial of their [] right to fundamental fairness and due process.

*Id.* at 56, 57, 58-59. In response, DCS asserted that "[w]hether the previous foster parents were sufficiently meeting [Child's] needs . . . is not relevant." *Id.* at 60. The court overruled the objection.

[18] When DCS later called Child's second foster placement as a witness, Father objected on the basis that DCS's position that Child's wellbeing in her prior placements was irrelevant was inconsistent with its presentation of a witness to testify "how [Child] was . . . almost [five] years ago[.]" Tr. Vol. 3 at 240. The court overruled that objection and allowed the second placement to testify.

[19] After the termination hearing, the trial court issued its findings of fact, conclusions of law, and order terminating Parents' relationship with Child. Parents now appeal.[3]

---

[3] Parents, DCS, the GAL, and Child have each participated in this appeal. On September 18, 2025, Child filed a notice with this Court pursuant to Indiana Appellate Rule 46(G) stating that she adopts the arguments presented by DCS in its Appellee's Brief, and our Court acknowledged that notice in an order issued September 25.

## Discussion and Decision

[20] Parents raise several issues on appeal, one of which we find dispositive. Specifically, Parents[4] argue that DCS's refusal to provide the names and contact information for Child's foster placements deprived Parents "of their [d]ue [p]rocess rights under the federal [and state] constitution[s][.]" Father's Br. at 24. They further contend that the trial court's "rulings on discovery and evidence risked [her] discovery, trial preparation[,] and presentation of evidence," requiring the termination order "be vacated based upon due process concerns." Mother's Br. at 34.

## 1. Standard of Review

[21] Parental rights are afforded heightened protection by the federal and state constitutions. *In re E.M.*, 4 N.E.3d 636, 641-42 (Ind. 2014). But these rights are not absolute and may be terminated when "parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008), *reh'g denied*. Generally, we review a trial court's decision to terminate parental rights "with great deference." *E.M.*, 4 N.E.3d at 640. However, where, as here, review of a termination order hinges on alleged due process violations, we apply a de novo standard of review. *See Scott v. State*, 258 N.E.3d 298, 301 (Ind. Ct. App. 2025) ("Whether a party was denied due

---

[4] Parents filed separate briefs but raised substantively identical issues on appeal.

process is a question of law that we review *de novo*." (quoting *Hilligoss v. State*, 45 N.E.3d 1228, 1230 (Ind. Ct. App. 2015)) (italics in original).

## 2. Due Process

[22] Our Supreme Court has recognized that "[t]he Due Process Clause of the U.S. Constitution and the Due Course of Law Clause of the Indiana Constitution prohibit state action that deprives a person of life, liberty, or property without a fair proceeding." *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011) (quoting *In re M.G.S.*, 756 N.E.2d 990, 1004 (Ind. Ct. App. 2001), *trans. denied*). Because "[p]arental rights constitute an important interest warranting deference and protection, . . . [w]hen the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process." *Id.* at 916-17.

[23] We apply three factors set forth by the U.S. Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976) to determine whether TPR proceedings comported with due process. *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012) (citing *Mathews*, 424 U.S. at 333). The three *Mathews* factors are: "(1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *Id.* (citing *C.G.*, 954 N.E.2d at 917). However, it is well-settled that because "[b]oth the State and the parent have substantial interests affected by [TPR] proceeding[s][,]" the determinative

factor in whether a due process violation occurred is "the risk of error created by DCS's actions and the trial court's actions." *C.G.*, 954 N.E.2d at 917-18.

[24] In looking at the risk of error created by the actions of DCS or the trial court, "we keep in mind that 'due process protections at all stages of [the] proceedings are vital because every CHINS [and TPR] proceeding has the potential to interfere with the rights of parents in the upbringing of their children.'" *In re D.H.*, 119 N.E.3d 578, 588 (Ind. Ct. App. 2019) (quoting *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014)), *as modified on reh'g by* 122 N.E.3d 832 (2019), *trans. denied*. Previous panels of this Court have reversed termination orders when DCS committed errors that deprived parents of statutory or procedural rights. *See In re A.P.*, 734 N.E.2d 1107, 1117 (Ind. Ct. App. 2000) (finding due process violations when, among other things, DCS failed to provide parents with copies of case plans as required by Indiana Code chapter 31-34-15, and the CHINS and TPR petitions did not satisfy the requirements of Indiana Code sections 31-34-9-3 (governing CHINS petitions) or 31-35-2-4 (governing TPR petitions)), *reh'g denied*, *trans. denied*; *D.H.*, 122 N.E.3d at 833-34 (reversing when DCS made "significant, multiple, and admitted procedural errors throughout [the] case, including its failure to follow its own mandatory procedures for ensuring the provisions of services").

[25] In fact, our Supreme Court has instructed "that 'if the State imparts a due process right, then it *must* give that right." *C.G.*, 954 N.E.2d at 917 (quoting *A.P.*, 734 N.E.2d at 1112) (emphasis added). As pertinent here, the due process

rights imparted by the State to parents in TPR proceedings include an entitlement "to (1) cross-examine witnesses, (2) obtain witnesses or tangible evidence by compulsory process, and (3) introduce evidence on behalf of the parent." *Id.* (citing I.C. § 31-32-2-3(b)). Accordingly, we turn to whether the names and contact information of Child's foster parents fall within the scope of information Parents are entitled to discover to exercise their due process rights under Indiana Code section 31-32-2-3(b).

## A. Scope of Discovery in TPR Proceedings

[26] TPR proceedings are civil in nature and are therefore governed by the Indiana Trial Rules. *See In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010) ("[A] CHINS proceeding is a civil action[.]"); I.C. § 31-35-2-2(2) (providing that TPR proceedings "are governed by the procedures prescribed by" the CHINS statutes); *see also* Ind. Trial Rule 1 ("[T]hese rules govern the procedure and practice . . . in all suits of a civil nature[.]"). The scope of discovery in civil cases is set forth in Trial Rule 26(B), which provides:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject-matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party, including . . . *the **identity and location** of persons having knowledge of any discoverable matter.* It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

T.R. 26(B)(1) (emphasis added).

[27] Here, DCS's arguments on appeal regarding the relevance and admissibility of information from Child's current and former foster parents demonstrate that Parents *could have* discovered admissible evidence from those individuals. In fact, DCS appears to agree with Parents that "Child's mental health and general wellbeing [were] relevant pieces of information," not only as of the date of the termination hearing but also "at any given time" throughout the CHINS and TPR proceedings. DCS's Br. at 40, 41. It further concedes that "evidence about Child's mental state, *testified to by foster parents* . . . was relevant to show how Child fared in the foster system and was also relevant to show what course of action DCS and the foster parents took when Child was in crisis[.]" *Id.* at 42 (emphasis added).

[28] These arguments cannot be squared with DCS's position that Parents had no right to conduct discovery to determine what information Child's foster parents might be able to provide regarding Child's mental state and wellbeing throughout the CHINS and TPR proceedings. Trial Rule 26 provides in no uncertain terms that a party may discover "the identity and location of persons having knowledge of any discoverable matter[,]" T.R. 26(B)(1), which in this case included Child's numerous foster parents because they could have, as DCS explains, provided "testimony regarding Child's mental state at various foster placements[.]" DCS's Br. at 41. DCS therefore could not—without infringing on Parents' right "to obtain witnesses or tangible evidence by compulsory

process" under Indiana Code section 31-32-2-3(b)(2)—refuse to disclose the identity and location of Child's foster parents.

[29] The dissent contends that the "names and addresses" of Child's foster placements "have no bearing on Child's best interest" and "are simply not relevant." *Post* at ¶ 44. But it is well-settled that "Indiana's discovery rules are designed to permit 'liberal discovery' in order to provide the maximum amount of information possible to both parties as they prepare their cases and reduce the possibility of surprise at trial." *Minges v. State*, 192 N.E.3d 893, 897 (Ind. 2022). Accordingly, a party refusing to identify certain persons under Trial Rule 26(B)(1) must demonstrate those persons "ha[ve] no possible relevance to the subject matter of the claim." *CIGNA-INA/Aetna v. Hagerman-Shambaugh*, 473 N.E.2d 1033, 1036 (Ind. Ct. App. 1985) ("[R]elevancy for the purposes of discovery is not the same as relevancy at trial."), *reh'g denied*, *trans. denied*. Here, DCS failed to prove as much regarding Child's foster parents, particularly since it called two of them as witnesses at the termination hearing even after refusing to identify them in discovery. *See infra* Section 2(C).

[30] Nonetheless, according to DCS, "[t]he information Parents sought was private pursuant to the [F]oster [P]arents[] [B]ill of [R]ights[,]" thus shielding Child's foster placements from having their information produced in discovery. DCS's Br. at 39. We now address that argument.

## B. Foster Parent Bill of Rights

In 2018, the legislature passed Indiana Code section 31-27-2-12, which provides that

> [DCS] shall, in collaboration with:
>
>> (1) current foster parents;
>>
>> (2) child placing agencies; and
>>
>> (3) other individuals and organizations with expertise in foster care services;
>
> develop and update periodically a statement that describes the rights of a foster parent that must be known as the "foster parent bill of rights."

I.C. § 31-27-2-12(a). In accordance with that statute, DCS promulgated the Foster Parent Bill of Rights, which provides, among other things, that "[f]oster parents have the right to . . . [h]ave information concerning the foster family kept confidential, except when release is required by law[.]" Mother's App. Vol. 2 at 110.

DCS contends that the Foster Parent Bill of Rights limits the scope of discovery in TPR proceedings. However, this is contrary to the general rule that "[p]arties may obtain discovery regarding any [relevant] matter, *not privileged*[.]" T.R. 26(B)(1) (emphasis added). DCS effectively argues that the Foster Parent Bill of Rights creates something akin to a privilege that shields foster parents'

information from discovery in TPR proceedings. According to DCS, "[t]here are sound policy reasons for this confidentiality" and "[i]f the foster parents' information is disclosed to the biological parents, the biological parents could interfere with the safety and security of the foster family, which could disrupt the placement." DCS's Br. at 39.

[33] While these policy considerations are well-taken, "a grant of privilege and the scope of that privilege are policy choices of the Legislature[,]" not the judiciary or administrative departments like DCS. *Goalsetter Sys., Inc. v. Est. of Gerwels*, 230 N.E.3d 341, 346 (Ind. Ct. App. 2024) (quoting *State v. Int'l Bus. Machs. Corp.*, 964 N.E.2d 206, 210 (Ind. 2012)), *trans. denied* (internal brackets omitted); *see also Terre Haute Reg'l Hosp., Inc. v. Trueblood*, 600 N.E.2d 1358, 1360 (Ind. 1992) ("Indiana generally recognizes that privileges are statutory in nature and that it is within the power of the legislature to create them."). DCS has not cited, nor have we found, any statutory authority indicating that the legislature intended to create the privilege DCS asks us to recognize in this appeal.

[34] In any event, to the extent the Foster Parent Bill of Rights confers an enforceable confidentiality interest on foster parents, it does not promise unfettered confidentiality. Instead, it provides that "[f]oster parents have the right to . . .[h]ave information concerning the foster family kept confidential, *except when release is required by law*[.]" Mother's App. Vol. 2 at 110 (emphasis added). The use of the phrase "except when release is required by law" contemplates a confidentiality limited by applicable law. Accordingly, the

confidentiality foster parents should expect in TPR proceedings is the same afforded to other records filed or exchanged by the parties in such proceedings, which are excluded from public access pursuant to statute and Indiana's Access to Court Records Rules. *See* I.C. § 31-39-1-2 (providing for the confidentiality of juvenile court records); Ind. Access to Court Records Rule 5(A)(1) (excluding from public access entire cases "declared confidential by statute").

[35] With respect to DCS's argument that the circumstances of this case justified shielding Child's foster parents' identifying information from Parents because they had already "crossed a boundary" with at least one of Child's prior placements, Supplemental Tr. Vol. 2 at 7, Trial Rule 26 provides a mechanism to address that concern without altogether barring disclosure of otherwise discoverable material. Specifically, Trial Rule 26(C)(2) provides that "[u]pon motion by any party . . . , and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that the discovery may be had only on specified terms and conditions[.]" It is commonplace in civil practice for trial courts to issue protective orders providing, for example, that discoverable material may be designated for viewing only by certain persons when good cause is shown that certain information should not be disclosed to the parties, but justice nonetheless requires that their counsel have access to it. *See, e.g.*, *Perez v. Mounce*, 110 N.E.3d 404, 409 (Ind. Ct. App. 2018) (holding that a party's actions were not

substantially justified when they refused to produce a contract subject to a nondisclosure agreement instead of requesting a protective order pursuant to Trial Rule 26(C) designating it "for attorney eyes only").

[36] An appropriately tailored protective order, rather than outright refusal to produce discoverable information, is the proper remedy when DCS raises legitimate concerns that "biological parents could interfere with the safety and security of [a] foster family[.]" DCS's Br. at 39. This approach properly balances the rights of parents to compel testimony and tangible evidence pursuant to Indiana Code section 31-32-2-3(b)(2) with any interest foster parents may have to protect their information from disclosure.

## C. Risk of Error

[37] Finally, we address DCS's contention that even if it should have been compelled to disclose the names and contact information of Child's foster placements, the trial court's failure to do so did not result in a due process violation warranting reversal because "there was no risk of error created by the State's chosen procedure[.]" DCS's Br. at 45. According to DCS, "Parents were heard at a meaningful time and in a meaningful manner and were able to cross-examine" the two foster parents DCS called as witnesses. *Id.* But Parents' due process rights included not only the ability to cross-examine the witnesses DCS chose to call, but also "to obtain witnesses" that might testify in their defense of DCS's case. I.C. § 31-32-2-3(b)(2). Indeed, Mother correctly argues that to hold that Parents' due process rights were satisfied merely by the

opportunity to cross-examine DCS's chosen witnesses "would permit [DCS] to . . . present only the evidence that best suits its case, while denying [parents] the opportunity to investigate, discover, identify, and call witnesses" of their own. Mother's Br. at 31.

[38]     In fact, DCS's fluid position as to the relevance and admissibility of information from Child's foster placements resulted in a fundamentally unfair presentation of evidence. When Parents sought to compel DCS to disclose the names and contact information of those placements so that they could investigate whether any of Child's foster parents could provide relevant testimony or evidence, DCS took the position that Parents' request was "wholly irrelevant[.]" Mother's App. Vol. 2 at 111. But DCS asserted the contrary position when it decided to present testimony from two of Child's foster placements at the termination hearing and in defending the trial court's overruling of Parents' objections to that testimony on appeal. *See* DCS's Br. at 41 ("[T]he trial court [] did not abuse its discretion when it allowed testimony regarding Child's mental state at various foster placements because [her] general condition [was] relevant . . . , and her wellbeing at any given time [was] relevant to the actions DCS and the foster families took at various instances[.]").

[39]     In light of these considerations, DCS's conduct in this case created a significant risk of error, in that Parents were foreclosed from pursuing pre-trial discovery that could have led to testimony or other evidence from Child's foster parents that Parents would have been entitled to present at the termination hearing

pursuant to Indiana Code section 31-32-2-3(b)(2). *See G.P.*, 4 N.E.3d 1158, 1166 (Ind. 2014) (explaining the balance struck by the *Mathews* factors "must provide 'the opportunity to be heard . . . in a meaningful manner.'" (quoting *Mathews*, 424 U.S. at 333)). We agree with Mother that "absent a reversal, we will never know what additional information could have been presented by [Parents] in defense of their parental rights." Mother's Br. at 28. Given the precious and fundamental nature of these rights, the risk of error here warrants reversal. *See In re E.P.*, 653 N.E.2d 1026, 1032 (Ind. Ct. App. 1995) (recognizing that in "a termination proceeding, . . . an erroneous result *obviously would be disastrous*") (emphasis added).

## Conclusion

[40] For the foregoing reasons, Parents' due process rights were violated by the trial court's failure to compel DCS to disclose the names and contact information of Child's foster parents because that information could have led to the discovery of admissible evidence Parents would have been entitled to present pursuant to Indiana Code section 31-32-2-3(b)(2). As such, we reverse and remand for further proceedings consistent with this opinion.[5]

---

[5] The GAL asks us to hold that it was not obligated to disclose Child's foster parents' names and contact information because that information "was within the control and regulation of [] DCS[.]" GAL's Br. at 10. Because we find that DCS should have been compelled to provide the information Parents requested, we need not decide whether the GAL was obligated to do so as well.

Reversed and remanded.

Weissmann, J., concurs.
Bradford, J., dissents with separate opinion.

ATTORNEYS FOR APPELLANT FATHER

Talisha R. Griffin
Matthew D. Anglemeyer
Marion County Public Defender Agency
Indianapolis, Indiana


ATTORNEYS FOR APPELLANT MOTHER

Talisha R. Griffin
Marion County Public Defender Agency
Indianapolis, Indiana


Daniel G. Foote
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE INDIANA DEPARTMENT OF CHILD SERVICES

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana


Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana


ATTORNEY FOR APPELLEE KIDS' VOICE OF INDIANA

Katherine Meger Kelsey
Kids' Voice of Indiana
Indianapolis, Indiana


ATTORNEY FOR APPELLEE A.W.

Rachel Vilensky
Child Advocates, Inc.
Indianapolis, Indiana

**Bradford, dissenting.**

[42] Because I believe that the discovery sought by Parents is simply not relevant to the determination of whether their parental rights to Child should be terminated, I respectfully dissent.

[43] "Parties may obtain discovery regarding any matter, not privileged, *which is relevant to the subject-matter involved in the pending action*[.]" Ind. Trial Rule 26(B)(1) (emphasis added). DCS petitioned to terminate Parents' parental rights on August 15, 2022. At the time, in order to terminate a parent's parental rights, DCS was required to prove

> (A) that one (1) of the following is true:
>     (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>     (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>     (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the

> reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[6]

[44] The only evidence relevant to this case is evidence pertaining to these factors.[7] The names and address of past placements, which have no bearing on Child's best interests moving forward, are simply not relevant to a determination of whether Parents' parental rights should have been terminated. Because the requested discovery was not relevant, I would conclude that the juvenile court did not violate Parents' due process rights by denying Father's discovery request for the names and addresses of all of Child's prior DCS placements.

[45] As for the merits of the juvenile court's decision to terminate Parents' parental rights to Child, in reviewing termination proceedings on appeal, we will not

---

[6] Indiana Code section 31-35-2-4 was amended, effective March 11, 2024, but, because the terminations were filed prior to this date, the amended statute does not apply to this case.

[7] To the extent that DCS seems to admit that some of the requested information may have been relevant, I disagree.

reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings and, second, whether the findings support the legal conclusions. *Id.*

[46] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* "A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it." *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[47] There was no dispute below that Child had been removed from Parents for at least six months, as Child had been removed from Parents' care since October of 2017. Child was seven years old when she was removed from Parent's care. (Appellant J.W.'s App. Vol. II p. 29) At the time of Child's removal from Parents' care, DCS alleged that Parents had failed to provide Child with a safe, stable, and appropriate living environment free from substance abuse. (Ex. Vol. 1 p. 34) The juvenile court's unchallenged factual findings indicate that at the

time of Child's removal, (1) the home was in deplorable condition and was unfit for children, (2) the toilet was not functional, (3) standing water was present in the bathtub, (4) the home smelled of feces and urine, (5) the home did not have electricity or running water, (6) an electrical cord led out the window into a tree and off of the property, (7) a knife was sticking out of the wall, and (8) rodent droppings were present in the refrigerator. (Appellant J.W.'s App. Vol. II pp. 28–29) Father also tested positive at this time for amphetamine, methamphetamine, and marijuana. (Ex. Vol. 1 p. 34)

[48] With regard to Parents' failure to complete the court-ordered services aimed at helping Parents to resolve the reasons for Child's removal and continued placement outside their home, the juvenile court made the following unchallenged factual findings:

> 94. Joyce Box was [Child's] Guardian Ad Litem [("GAL")] from February 2018–April 2021, for three years.
> 95. Ms. Box attended a child and family team meeting ("CFTM") in July 2018. Parents expressed their dissatisfaction with [Child's then] placement. [Parents'] utilities were still off and they said they were not screening because they could not make phone calls to call the drug screen line and learn if they had to screen each day. They required wifi to make a call. Ms. Box offered to come see their home. Parents were angry and responded that she could not come to their home.
> 96. The following month, … [P]arents still did not have working utilities and were still not screening. These things were discussed with them.…
> 97. At the January 2019 Permanency Hearing, Ms. Box recommended a suspension in parenting time because of

[Child's] behaviors and her emotional state.…
*****

99.  Visitation Facilitator, Anthony Harmon also agreed with suspension of parenting time, and he told the Court at the January 2019 hearing.  He had noted some resistance on [Child's] part to physical contact with [Father].  He noted some lack of engagement of [P]arents in visits with redirection needed to reduce phone and iPad use.

100.  At every hearing that Ms. Box attended and at every CFTM, [P]arents' lack of engagement in services, especially drug screens, were raised.
****

102.  At no time did [P]arents come into compliance for a period of 60 days while Ms. Box was assigned.
****

105.  …  At no time did the team recommend placement back with [P]arents.
****

107.  Tiffani Babbs was the Family Case Manager from June 2019 until 2024.

108.  FCM Babbs … warned [P]arents that if they didn't comply [with services], the plan would change.
****

111.  Parents never got to 60 days of compliance in all services.
****

116.  [Child's] 4th placement [was] disrupted because [P]arents delivered a box to her placement[.]  The box had a stuffed animal and other small items.  The box had a hidden note with a phone number on it.  The placement became fearful that [P]arents know their address and they requested [Child] be removed from their care.

117.  In Feb 2021, … Parents didn't come [to a scheduled team meeting].

118.  FCM Babbs continued to send parents updates on [Child].
****

121. FCM Babbs gave [P]arents screening information at least 10 times.

122. FCM Babbs would have expected 225 screens for each parent[ ] as screens were in place for the entire time she was on the case. However, FCM Babbs only received 9 screens for each parent.

\*\*\*\*

130. [GAL Brittany] Montgomery went to see [P]arents['] home in 9/2023. A padlock was on the chain-link fence/gate.

\*\*\*\*

132. Parents contacted her after the visit asking why she and the FCM were snooping and resorted to vulgarities.

\*\*\*\*

134. FCM Deandre Nwannanunu was assigned to [Child's] case in July 2024.

135. He attempted to contact parents but was not successful.

136. He verified that the drug screen referral is still open and active for [P]arents' use.

\*\*\*\*

139. [Father] made efforts to rehabilitate the house.

140. [Father] maintains the electricity was turned off the day the case opened.

141. [Father] is working to pay off the electric bill.

\*\*\*\*

143. Father did not do random drug screens because he doesn't trust DCS.

144. His last screen was in 2021.

145. He did not screen at all in 2022.

146. He did not screen at all in 2023.

147. He did not screen at all in 2024.

\*\*\*\*

150. [Father] was previously accused of sexual misconduct.

151. [Parents] had a package delivered to a foster placement despite not being allowed to know the placement's address.

\*\*\*\*

154. [Mother] hasn't completed a random drug screen since 2021, due to her mistrust of DCS.

155. She did not screen at all in 2022.

156. She did not screen at all in 2023.

157. She did not screen at all in 2024.

****

160. [Mother] agrees [Child] is doing well in her current placement.

****

167. [Visit facilitator Morey] Strozier reiterated to [P]arents the importance of compliance with [services].

168. Ms. Strozier's referral for services was closed out unsuccessfully due to non-compliance with the services in April 2019.

169. [Father] tested positive for Methamphetamine and Amphetamine on 3/26/19 and 4/16/2019.

170. [Mother] tested positive for Amphetamine 11/29/17.

171. [Mother] tested positive for Amphetamine and Methamphetamine 3/28/19 and 4/16/19.

Appellant J.W.'s App. Vol. II pp. 34–37.

[49] With regard to Child's current placement and need for permanency, the juvenile court found as follows:

38. [Child] was placed in her current placement with [Foster Parents] on March 23, 2022.

39. [Child] has participated in individual therapy, equine therapy, EMDR therapy and takes medications for anxiety and depression, for ADHD, and for Asthma/Allergies.

40. [Child] participates in extra-curricular activities.

41. [Child] is bonded to another child in the home who has been adopted by [Foster Parents] and had similar diagnoses and DCS involvement.

42. For the most part, [Child] has adjusted well to the home.

****

44. [Child] expressed to [Foster Mother] her fear of removal as her one year in placement was coming up and in her past placements, her behaviors led to removals.

45. [Foster Mother] reassured [Child] that she would never be removed from their home due to their request and that they would never choose to terminate the placement.

46. [Foster Parents] wish to adopt [Child] because they love her and they can meet her needs.

47. [Child] is currently 14 years old.

48. [Child] has spent six years, nearly seven years in foster care.

49. [Child] remembers that there was no electricity, not much food, and it was messy in the home she lived in with [Parents]. She remembers yelling, drug use in the home being ignored.

50. [Child] had facetime contact with [Parents] in March 2023.

51. [Child] told [Parents] then that she wants to be adopted and remain with [Foster Parents].

52. [Child] came to Court to testify voluntarily because she wants her voice to be heard. She testified to say what she wants for her life and how she feels. [Child] wishes to be adopted because she loves [Foster Parents] and they love her.

53. [Child's] session with [Parents] was ended by her therapist Chad Myers because she was becoming emotionally dysregulated after [Parents] talked over her and told her she had been coached.

****

56. [Child] has made phenomenal progress, and her sessions are more future focused now and are reduced to every two weeks. She is using coping skills and managing well.

57. [Child] does express frustration with the court system and the length of time she has spent in placement and wants to have a voice.

58. Mr. Myers does not recommend that [Child's] placement be changed. She has had great success.

59. [Child] saw Elizabeth Everett for EMDR therapy from April

2022 through September 2022.

****

61. The goal of the EMDR was to desensitize any traumatic memories due to the history [Child] identified.

62. The specific negative core beliefs [Child] identified were that she did not feel safe, she did not feel cared for, she was not loved.

63. [Child] specifically identified events in the home to include a lack of food or other supplies and fighting in the home. These were the only events [Child] specifically identified to address.

****

69. [Child] stated she did not want to see [P]arents or reunite with them.

70. [Child] stated she felt safe in her current placement.

71. It is Ms. Everett's opinion that if [Child] was removed from this safe placement, the effect would be negative.

72. [Child] had seven placements over the past seven years since removal. In addition she had respite placements and acute stays in hospitals related to her behaviors.

****

106. At the fifth Permanency Hearing in December 2019, Ms. Box recommended a plan change to adoption. She felt it was in [Child's] best interest … and [P]arents were minimally compliant after over two years.

****

126. [At some point, a] virtual meeting for [Child] and [P]arents to meets was scheduled and GAL Montgomery attended.

127. [Child] attempted to tell [P]arents the things she wanted to discuss but she could not get a lot out. Parents discounted what she said and told her that DCS has brainwashed her and that she was not remembering the right things.

128. An attempt was made to intervene and redirect [P]arents to allow [Child] to speak, but [Parents] spoke over [Child] and the call was ended.

****

179. The GAL agrees that the permanency plan of adoption is in [Child's] best interests.

Appellant J.W.'s App. Vol. II pp. 31–35, 37. The juvenile court additionally found that in light of Parents' lack of compliance, they should not be given additional time, beyond the seven years that had already passed, to remedy the safety concerns. (Appellant J.W.'s App. Vol. II p. 36)

[50] Again, Parents did not challenge any of the above-quoted factual findings, which we accept as true. *See Moriarty v. Moriarty*, 150 N.E.3d 616, 626 (Ind. Ct. App. 2020) (providing that unchallenged findings must be accepted as true), *trans. denied*. The findings clearly demonstrate that Parents had failed to remedy the reasons for Child's removal from their care and that termination of Parents' parental rights is in Child's best interests. As such, I vote to affirm the judgment of the juvenile court.